———————

No. 96-1322

———————

United States of America,          *
                                   *
               Appellee,           *
                                   * Appeal from the United States
     v.                            * District Court for the
                                   * Southern District of Iowa
Melissa Jean Luna,                 *
                                   *
               Appellant.          *

———————

Submitted:  May 14, 1996

Filed:  August 29, 1996

———————

Before McMILLIAN, FAGG and LOKEN, Circuit Judges.

———————

McMILLIAN, Circuit Judge.


     Melissa Jean Luna appeals from a final judgment entered in the
District Court[1] for the Southern District of Iowa, upon a jury
verdict, finding her guilty of possession with intent to distribute
methamphetamine and possession of cocaine in violation of 21 U.S.C.
§ 841(a)(1), 18 U.S.C. § 2.  The district court sentenced Luna to
41 months imprisonment, 3 years supervised release and a special
assessment of $50.00.  For reversal, Luna argues the district court
abused its discretion in denying her motion for new trial on the
basis of newly discovered evidence because false evidence was
introduced to establish a motive for her participation in an armed
robbery.  For the reasons discussed below, we affirm the judgment
of the district court.

———————————————

     [1]The Honorable Harold D. Vietor, United States District Judge
for the Southern District of Iowa.

According to the government's theory of the case, in December 1993, Luna, her father John Kime, with whom she had only recently become acquainted, Clifford Brown, Randy Groves, and Bobby McGee decided to rob Kenny Eaton and his mother Sandra Eaton. Kime was the "mastermind" of the robbery. At the time Luna was Kenny Eaton's girlfriend and she lived with the Eatons. The Eatons were drug dealers. Kime was also a drug dealer. Luna provided background information about the Eatons' house -- the layout, the location of drugs, guns and money, and the presence of a guard dog. Brown, Groves and McGee carried out the armed robbery on December 5, 1993. Luna was present in the house at the time of the robbery and controlled the guard dog during the robbery; the robbers treated her as a robbery victim in order to conceal her role in the robbery. The robbers took money, jewelry, guns, and about 1.5 ounces of methamphetamine and 10 grams of cocaine. The robbers gave Luna the cocaine and split the methamphetamine among themselves and sold it. The Eatons had a total of 4 ounces of methamphetamine and the government speculated that Luna probably sold the "missing" 2.5 ounces of methamphetamine.

A federal grand jury indicted Luna and charged her with conspiracy to attempt to possess with intent to distribute methamphetamine and cocaine in violation of 21 U.S.C. § 846 (count 1), possession with intent to distribute methamphetamine and cocaine or aiding and abetting that possession in violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (count 2), and causing or aiding and abetting the use or carrying of a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. §§ 924(c)(1), 2 (count 3). All three counts arose out of the December 5, 1993 armed robbery of the Eatons. The government dismissed count 1 at trial. At trial the three robbers testified about Luna's assistance before and during the robbery and her receiving the cocaine for her assistance. Groves also testified, on re-direct

-2-

over a defense objection, about a debt Luna allegedly owed Kime because of a check which Kime had cashed for her.  The government

argued that the check incident explained why Luna participated in the robbery, that is, in order to "pay back" Kime for the cashed check. Counts 2 and 3 were submitted to the jury. The jury found Luna guilty of possession of methamphetamine with intent to distribute, possession of cocaine and aiding and abetting the use or carrying of a firearm in connection with a drug trafficking offense.

Luna filed a motion for new trial and a motion for judgment of acquittal on count 3 (the firearms count). The district court granted the motion for judgment of acquittal on count 3 and denied the motion for new trial. United States v. Luna, Criminal No. 95-79 (S.D. Iowa Jan. 11, 1996) (memorandum opinion, ruling and order). Luna argued that the evidence about the check incident was false, irrelevant and prejudicial. Before Luna's trial, Groves had pleaded guilty pursuant to a plea agreement. The stipulation of facts entered into as part of Groves's plea agreement provided in part that "[o]n or about December 5, 1993, Clifford Brown, Bobby McGee, and [Groves,] at the direction of Jack Kime, robbed Sandy Eaton at her residence . . . regarding a debt she previously owed to Kime." During direct examination of Groves, the following exchange occurred:

> Government attorney: In the time period leading up to the Eaton robbery, had Melissa Luna engaged in some sort of a financial transaction with Jack Kime?
>
> Groves: I know she got-- she had a check and she had Jack cash it for her.
>
> Government attorney: Can you explain the circumstances behind that for the jury?
>
> Defense attorney: Your Honor, I'll object on the basis of 404(b).

District court: I'm going to sustain the objection. You may make an offer out of the presence of the jury. I don't know what this is about, I don't know where we're going, and unless and until I know what it's about and I

where you're going, the objection is sustained.  You may
possibly demonstrate to me that it's relevant.

Government attorney:  Yes, and it's not 404(b).

District court:  I don't know at this point.

Government attorney:  Rather than send the jury out at
this point in time, I prefer to go on and cover that at
some other point in time.

II Trans. at 172.

On cross-examination, defense counsel questioned Groves about
the reference in the plea agreement's stipulation of facts to the
debt Sandy Eaton owed Kime:

Defense attorney:  Were you aware at the time you signed
this stipulation of some debt between Ms. Eaton
(referring to Sandy Eaton) and Mr. Kime?

Groves:  Well, I wasn't really aware, you know, of
actually a debt.  It seemed like everybody owed Jack,
even if they didn't.  If you knew him, you'd know what I
was talking about.

Defense attorney:  Well, did you or did you not know when
you signed this agreement that there was a debt from Ms.
Eaton to Mr. Kime?

Groves:  I didn't believe that there was actually a debt.

Defense attorney:  So even though you thought that this
thing in this factual stipulation was not true, you
signed it and agreed to it anyway?

Groves:  I didn't recall it being in there.

Id. at 204-05.

On re-direct examination, the government attorney questioned
Groves about the reference to the debt in the stipulation of facts:

Government attorney:  Defense counsel asked you to look at subparagraph B at the top of that page; is that right?

Groves:  That's right.

Government attorney:  And I believe the statement was relative to the robbery at the Eaton residence, reference to Sandy Eaton, and then it says, "regarding a debt she'd previously owed to Kime."

Groves:  Yes.

Government attorney:  Who in fact did you know relative to the Eaton robbery who owed a debt to Jack Kime at that point in time?

Groves:  Just Missy, I believe.  That's about it.

Government attorney:  What was that?

Defense attorney:  I'll object.  I think this is the same 404(b) problem.

Government attorney:  I think counsel has clearly opened up this area of inquiry.

District court:  The objection is overruled.

Groves:  It was over a check.

Government attorney:  What were the circumstances?

Groves:  Missy got a check from the lawyer for $1,800 and asked her dad if he'd cash it.  He cashed it.  And then about three or four days later when he went to deposit it, they told him the check was no good, stopped payment on it.  He found out she went to the lawyer and told the lawyer she'd lost the check and the lawyer wrote out another check and she cashed it.

Government attorney:  So Missy Luna actually cashed both of the checks?

Groves:  Yes, she did.

Government attorney:  Jack Kime felt he was out $1,800?

Groves:  Yes.  He was upset.

Government attorney:  And that was the only person you know of that was actually involved in the Eaton robbery that owed Jack Kime at that time?

Groves:  Yes.

Government attorney:  Did Jack Kime want that money back?

Groves:  He was pretty pissed off about it.

Government attorney:  After the Eaton robbery, did Jack Kime consider that $1,800 taken care of?

Groves:  He never really said.  Nobody really pushed the issue because it was his daughter.

Id. at 213-15.


In closing argument, the government attorney referred to the check incident as follows:


I think also that it's clear that Melissa Luna suggested the Eaton robbery.  There is absolutely no evidence that anyone else came up with the idea of robbing Kenny Eaton for drugs.  There's no evidence that anyone else really knew what would be there, what the circumstances were with the Eatons, and promoted the idea originally of robbing the Eatons.

There is a suggestion by at least one of the witnesses on redirect examination following cross-examination that in fact this may have grown out of a debt that Melissa Luna owed to her father, Jack Kime. If you remember, that was the testimony about the check from an attorney for $1,800 that Melissa Luna had Jack Kime cash for her, then the check turned out to be no good, and then Melissa Luna went back to the attorney and got another check that was good and cashed it, and she kept both sets of the money.

Now, that's the record that's before you, and that happened at or about, approximately right before the time of the Eaton robbery.

Motive is not an element of the crime, but you certainly could find a reason why Melissa Luna might be suggesting doing the crime, to get that credit back, get this paid off.

-10-

Slip op. at 7-8, <u>citing</u> partial transcript of final arguments.

In closing argument, defense counsel referred to the check incident as follows:

> By the way, on this matter about the drug debt to Sandy Eaton, the prosecution's theory about this matter, in Mr. Groves' plea agreement was this had to do with a debt that Melissa Luna owed to her father, and they tell some story about a check being cashed twice. Just read Mr. Groves' stipulation attached to his plea agreement. See if you find anything about a check of Missy Luna in there. It just says "Rob Sandy Eaton at her residence," gives the address, "regarding a debt she previously owed to Kime." I think that's pretty clear.

Id. at 8.

In rebuttal closing argument, the government attorney referred to the check incident as follows:

> But contrary to what counsel led you to believe, Randy Groves specifically said there was no deal. The only debt that he could remember that any of these people involved in this situation owed, was the debt that Melissa Luna owed to Jack Kime. Please, check your notes on that.

Id.

After the verdict but within the time for filing a motion for new trial, defense counsel investigated the check incident and presented evidence, which is not disputed by the government, that, in fact, the check incident between Luna and Kime had occurred in late January 1994, about two months after the Eaton robbery. Thus, the check incident occurred after the robbery and could not have been a motive for Luna's participation in the Eaton robbery. Luna did not argue that Groves had deliberately lied about the timing of

the check incident or that the government attorney knew Groves's testimony about the timing of the check incident was false.

The district court denied the motion for new trial. First, the district court concluded that the testimony about the check incident was properly admitted under Fed. R. Evid. 404(b) as relevant on the issue of motive, that is, it provided an explanation why Luna would participate in the Eaton robbery. Slip op. at 9. The district court noted that if it had been established at trial that the check incident did not occur until after the robbery, the check incident could not have been a motive and the testimony would not have been admissible. Id. The district court also concluded that the evidence about the timing of the check incident was not in fact newly discovered and that Luna had not been diligent. Id. at 10 (noting that, although Luna was an active party to the check incident and knew about it at the time of trial, she did nothing until after trial). The district court characterized the new evidence as merely impeaching the credibility of Groves, id., and concluded that, given the evidence of guilt, even if the evidence about the check incident had been excluded, the jury would not have acquitted Luna. Id. Finally, the district court also considered the motion as an ordinary motion for new trial and concluded that "the interests of justice" did not require new trial. Id. at 11 (noting Luna's failure to respond to the check incident at trial and that exclusion of the evidence would most likely not result in acquittal on retrial); see 3 Charles A. Wright, Federal Practice & Procedure Criminal § 557, at 316 (2d ed. 1982) (motions for new trial on the basis of newly discovered evidence made within 7 days of verdict or finding of guilt evaluated as ordinary new trial motions and not under stricter test applied to motions for new trial based on newly discovered evidence). This appeal followed.

For reversal, Luna argues the district court abused its discretion in denying her motion for new trial on the basis of newly discovered evidence because the evidence about the timing of

-14-

the check incident was in fact false. For this reason, she argues the check incident evidence was irrelevant and highly prejudicial

because the check incident could not have provided a motive for her participation in the underlying armed robbery. We hold the district court did not abuse its discretion in denying the motion for new trial.

> In this circuit, it is well-settled that there are five prerequisites which must ordinarily be met to justify a new trial on the ground of newly discovered evidence: (1) the evidence must in fact be newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal. Moreover, "[t]he grant or denial of a motion for new trial based on newly discovered evidence is within the broad discretion of the trial court, and the trial court's decision will not be reversed absent a clear abuse of discretion."

United States v. Begnaud, 848 F.2d 111, 113 (8th Cir. 1988) (citations omitted). We agree with the district court that the evidence about the timing of the check incident was not newly discovered evidence. The evidence about the timing of the check incident was not discovered since the trial and the facts do not show that Luna acted with diligence. Luna was an active party to the check incident; there was no showing at the time of trial that she did not recall the check incident or when it occurred. She knew about the evidence and could have told defense counsel about the timing of the check incident at the time of trial but did not do so.

Even assuming for purposes of argument that the evidence was newly discovered, the district court did not abuse its discretion because the evidence about the actual timing of the check incident

-16-

was not likely to produce an acquittal.  The evidence would have merely impeached Groves's testimony and would not have affected the

testimony of the two other robbers implicating Luna in the Eaton robbery.

Finally, we reject Luna's argument that the district court erred in admitting the evidence about the check incident as evidence of other crimes under Fed. R. Evid. 404(b). Luna correctly argues the check incident was irrelevant as evidence of motive because the check incident occurred after the Eaton robbery. She also argues that, even if relevant, it was unfairly prejudicial. Fed. R. Evid. 403. However, the government did not know at the time of trial that the evidence about the timing of the check incident was in fact false. The present case does not involve the government's knowing or reckless or negligent use of false testimony; here, the government innocently used false testimony. United States v. Tierney, 947 F.2d 854, 860-61 (8th Cir. 1991) (if government innocently used false testimony, defendant must show acquittal would probably result on retrial). The government argues the evidence about the check incident was not extrinsic evidence and thus not within the scope of Fed. R. Evid. 404(b). We agree.

"[W]here evidence of other crimes is 'so blended or connected, with the one[s] on trial as that proof of one incidentally involve[s] the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged,' it is admissible as an integral part of the immediate context of the crime charged." United States v. Bass, 794 F.2d 1305, 1312 (8th Cir.) (citing United States v. Derring, 592 F.2d 1003, 1007 (8th Cir. 1979)), cert. denied, 479 U.S. 869 (1986). "When the other crimes evidence is so integrated, it is not extrinsic and therefore is not governed by Rule 404(b)." United States v. Bass, 794 F.2d at 1312; see United States v. Swinton, 75 F.3d 374, 377-78 (8th Cir. 1996).

-18-

When "it is very difficult to draw a line between the crime charged and other wrongful circumstances with which it is inextricably intertwined," the intrinsic-extrinsic dichotomy blurs and loses legal significance. . . . "It matters little whether the evidence is viewed as lying beyond the scope of Rule 404, or as satisfying the test of Rule 404(b)."

United States v. Mills, 704 F.2d 1553, 1559 (11th Cir. 1983) (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 404[10], at 404-60 to 404-61 (1982) (Weinstein's Evidence)), cert. denied, 467 U.S. 1243 (1984); see United States v. Tate, 821 F.2d 1328, 1331-32 (8th Cir. 1987) (analysis of other crimes evidence as both intrinsic and extrinsic evidence), cert. denied, 484 U.S. 1011 (1988); United States v. White, 645 F.2d 599, 602-03 (8th Cir.) (same), cert. denied, 452 U.S. 943 (1981).

[T]aking such evidence out of the scope of 404(b) analysis does not remove all limits on the admission of detailed wrongful acts testimony. The dictates of rule 403 must still be applied to ensure that the probative value of this evidence is not [substantially] outweighed by [the danger of unfair prejudice].

United States v. Bass, 794 F.2d at 1312, citing 2 Weinstein's Evidence ¶ 404[10], at 404-80 (1985).

In the present case, the evidence about the check incident constituted an integral part of the operative facts of the crime charged and as such was intrinsic evidence. The government would have been hard pressed to explain its theory of the case, given the factual circumstances and the relationship between Luna and Kenny Eaton, without advancing a reason why Luna would have participated in the Eaton robbery. Adequately explaining the circumstances of the Eaton robbery, which was the basis for the drug crimes with which Luna was charged, necessarily invited reference to the check

-20-

incident.  Alternatively, the evidence about the check incident was relevant to an issue other than the defendant's bad character or

criminal propensity, that is, her possible motive for participating in the robbery.  The evidence about the check incident was not unfairly prejudicial; it involved a relatively minor crime or bad act and constituted only a limited part of the evidence against Luna.  Moreover, the government had already introduced evidence that Luna had participated in the robbery of her boyfriend and his mother.  The check incident lost much of its prejudicial impact when viewed in light of that more sensational revelation.

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.