# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2080EM

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the Eastern District |
| | * | of Missouri. |
| John P. Bewig, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 17, 2003

Filed: December 24, 2003

_____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

John P. Bewig appeals from his conviction for conspiring to distribute a list I chemical, pseudoephedrine, having reasonable cause to believe the listed chemical would be used to manufacture a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(c)(2). He raises numerous arguments, including insufficiency of evidence, improper admission of evidence, and that the statute is unconstitutionally vague. Alternatively, he argues that should his conviction stand, he was improperly sentenced.

For the reasons stated below, we affirm the conviction and the sentence imposed.

I.

Beginning July 30, 2002, the Drug Enforcement Agency (DEA) began investigating the One Stop/Citgo gas station owned and managed by Mr. Bewig. The investigation began after Pam Hart, an employee of Wease Distributing, alerted the DEA that Mr. Bewig was ordering large amounts of generic pseudoephedrine. Ms. Hart had previously notified Mr. Bewig that his station ordered much greater quantities of pseudoephedrine than the average station. She alerted Mr. Bewig to the use of pseudoephedrine in the production of methamphetamine and advised him that retail sales of products containing pseudoephedrine should be limited to three units per customer.

The DEA investigation uncovered the following facts. First, Mr. Bewig, as owner and manager of the station, was solely responsible for ordering pseudoephedrine from the distributor. Second, although Mr. Bewig nominally imposed a three-unit limit on the sale of pseudoephedrine products, that rule was often disregarded. Third, Veronica Heise, a clerk at the station and co-conspirator, sold pseudoephedrine to co-conspirator David Combs[1] in excess of the three-unit maximum on numerous occasions. Fourth, Mr. Bewig told investigators he knew pseudoephedrine was used in the production of methamphetamines. Fifth, at the request of a patron, Kimberly Hill, Mr. Bewig sold case amounts[2] of pseudoephedrine, far in excess of the three-unit limit. Sixth, Mr. Bewig knew that he ordered and sold substantially more pseudoephedrine than other gas stations.

_____

[1]Ms. Heise and Mr. Combs were indicted along with Mr. Bewig. Both pleaded guilty and testified against Mr. Bewig at trial.

[2]A case contains ten units.

Mr. Bewig was indicted on October 31, 2002, for knowingly and intentionally conspiring with parties known and unknown to distribute pseudoephedrine having reasonable cause to believe that the chemical would be used to manufacture a controlled substance. He was found guilty on January 23, 2003, and given a twenty year prison sentence on April 18, 2003. This appeal followed.

II.

Mr. Bewig's appeal for insufficient evidence raises an interesting question of law. Essentially, he argues that a seller can never be a member of a conspiracy when his relationship to the alleged conspiracy is only that of a seller, and that a second agreement, beyond the sales transaction, is needed to support a conspiracy conviction. He relies on United States v. Falcone, 311 U.S. 205 (1940), for support. We agree with his argument but find that a second agreement had been reached.

In Falcone, the Supreme Court held: "[t]hose having no knowledge of [a] conspiracy are not conspirators . . . and one who without more furnishes supplies to an illicit dealer is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the [illicit dealer] was a party but of which the supplier had no knowledge." Id. at 210-11. The Court later clarified its holding, explaining: "that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." Direct Sales Co. v. United States, 319 U.S. 703, 709 (1943). Our Circuit requires that there "be some understanding 'beyond' [a sales agreement] before the evidence can support a conviction for a conspiracy." United States v. West, 15 F.3d 119, 121 (8th Cir. 1994). For example, the sale of drugs from one drug dealer to another, even on repeat occasions, does not, standing alone, constitute participation in a larger drug conspiracy. Ibid. There must be some evidence that drugs were purchased to be resold. Ibid.

-3-

In searching the evidence presented at trial for a second, illicit agreement, it is important to understand that while the language used in Falcone, Direct Sales, and West suggests a subjective analysis, we actually apply an objective standard. To meet its burdens of production and persuasion in charging a defendant with conspiracy, the government is not required to prove an express understanding between the conspirators. United States v. Cabrera, 116 F.3d 1243, 1245 (8th Cir. 1997). Instead, "the government need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [the defendant's] actions." United States v. Fregoso, 60 F.3d 1314, 1325 (8th Cir. 1995). Borrowing from one of our recent contract-law cases, we look "to the parties' objective manifestations of intent and interpret those manifestations as a reasonable person would." Visiting Nurses Ass'n, St. Louis v. VNAHealthcare, Inc., 347 F.3d 1052, 1054 (8th Cir. 2003). Thus, while a mere sales transaction, standing alone, cannot support a conspiracy conviction, a sales transaction placed in context can, if a reasonable person would impute a second conspiratorial agreement to the parties' actions and the circumstances surrounding the sales transaction.

We believe a reasonable jury could have concluded that Mr. Bewig entered into a conspiratorial agreement with parties known and unknown to distribute pseudoephedrine for the purposes of making illegal narcotics. Our analysis is not driven by a search for a smoking gun, but instead our conclusion is reached by an objective analysis of certain key facts.

First, it is of consequence to us that pseudoephedrine has limited legal uses. The Supreme Court has instructed that the type of good sold should have some effect on the conspiratorial calculus. Direct Sales, 319 U.S. at 710. This is true because "not [all articles of commerce] have inherently the same susceptibility to harmful and illegal use." Ibid. Pseudoephedrine is an over-the-counter decongestant. Unlike sugar, if you do not have a cold, a headache, or sinus problems there are remarkably few things you can do with pseudoephedrine except make illegal narcotics. Sales of

-4-

such a limited product to routine customers, and in bulk, suggest that Mr. Bewig was acting merely as the "legitimate" front to an organized drug scheme.

Second, Mr. Bewig knew that pseudoephedrine was used to make methamphetamine. While knowledge of a potential use is not in and of itself dispositive, it can be dispositive when combined with other facts. Id. at 709.

Third, Mr. Bewig's distributor informed him that he was ordering pseudoephedrine at a disproportionately high rate. Thus, unlike single transactions for staple goods, or goods susceptible to multiple legal uses, Mr. Bewig's disproportionately high sales of pseudoephedrine suggest agreement in the illegal endeavor. In the words of Learned Hand, a would be conspirator "must in some sense promote [the] venture himself, make it his own, have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 211 (1940). By making pseudoephedrine available in large amounts after gaining knowledge of its likely end, Mr. Bewig did just that. He knowingly made the supplying of a necessary ingredient to illegal drug production a continuing part of his business; he became part of the venture.

Fourth, the nature of the sales transactions suggests an illegal goal. Mr. Bewig had in the past sold pseudoephedrine in case amounts. While he nominally had a three-unit limit, pseudoephedrine was continually sold in larger than three-unit amounts, or to the same patron over a period of a day in multiple three-unit sales. Cf. United States v. Prieskorn, 658 F.2d 631, 634-35 (8th Cir. 1981) (between dealers, a presumption of participation in a larger drug conspiracy can arise from amount of drugs sold). While there was some dispute as to Mr. Bewig's knowledge of these transactions, a reasonable jury could have imputed the knowledge to him, as he was solely responsible for reordering the pseudoephedrine once the station's supply was exhausted.

In short, we cannot say as a matter of law that there was insufficient evidence to support the conviction. A reasonable jury could have concluded that Mr. Bewig not only sold pseudoephedrine with the knowledge that it would be made into methamphetamine but agreed to become part of that illegal end. A man cannot defeat his conviction by hiding behind an unreasonable veil of ignorance.

III.

Mr. Bewig also argues that the District Court[3] erred in admitting the testimony of Kimberly Hill. Before the date the indictment alleges the conspiracy began, Ms. Hill purchased from Mr. Bewig case quantities of pseudoephedrine. Mr. Bewig argues that because the substance of Ms. Hill's testimony spoke merely to his knowledge that sales were taking place, her testimony did not bear on any issues in the case. We disagree.

Evidence of prior acts is admissible if it is relevant to a material issue. United States v. Jones, 255 F.3d 916, 919 (8th Cir. 2001). Mr. Bewig's argument misconstrues the implications of knowledge evidence. In essence, he argues that because the government must show more than mere knowledge, evidence of knowledge is immaterial. As discussed above, however, knowledge, placed in context, and with other evidence, can speak to agreement. Thus, evidence of knowledge *is* material to the ultimate issue of conspiratorial agreement.

Since we find that Ms. Hill's testimony spoke to a material issue, and its prejudicial effect did not outweigh its probative value, we cannot say that the District Court's admission of the evidence was in error.

---

[3]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

## IV.

As a last attempt to reverse his conviction, Mr. Bewig contends that 21 U.S.C. § 841(c)(2)[4] does not provide objective criteria by which individuals may know what is illegal, and is thus unconstitutionally vague. Further, he argues that the statute places an unconstitutional burden on defendants to read the purchaser's minds and predict the future. We disagree.

As a general matter, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited . . .." Kolender v. Lawson, 461 U.S. 352, 357 (1983). We find that Section 841(c)(2) satisfies this standard. The section requires a person to possess or to distribute certain identified chemicals knowing, or having reason to know, that the chemicals will be used in the production of illegal narcotics. The section does not punish the inadvertent sale of a listed chemical to an illegal drug manufacturer, but instead punishes only those sales where the seller understands, or should reasonably understand, that the chemical will be used illegally. Thus, we find Mr. Bewig's argument without merit. The statute does not require a

---

[4]21 U.S.C. § 841(c):

Any person who knowingly or intentionally –

. . .

> (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance . . .

> shall be fined in accordance with Title 18 or imprisoned for not more than 20 years in the case of a violation of paragraph (1) or (2) involving a list I chemical . . ..

defendant to read a purchaser's mind. Instead, it instills punishment only when a defendant knows or should know beforehand the illegal end his sale will produce. Cf. Posters 'n' Things, Ltd. v. United States, 511 U.S. 513, 524 (1994) ("It is sufficient that the defendant be aware that customers in general are likely to use the merchandise with drugs."). A reasonable person would understand what conduct is prohibited by this standard, and could discern what activities to forgo so as to comply with the law. The statutory section is not unconstitutionally vague.

V.

We turn to Mr. Bewig's appeal from the District Court's sentence.

He first argues that the District Court erred in determining that he illegally distributed three kilograms or more of pseudoephedrine. He claims that because it is impossible to know which of his sales were legal and which were part of the conspiracy, there is no way of knowing what quantity of pseudoephedrine was ultimately used in the production of methamphetamine. Therefore, he argues, the District Court erroneously assigned him 38 as a base offense level. See U.S. Sentencing Guidelines Manual § 2D1.11(d) (2003) (the base offense level for three kilograms or more of pseudoephedrine is 38). We disagree.

In sentencing a defendant on a drug charge where no drugs were seized, the Sentencing Guidelines direct the district court to approximate the quantity of drugs attributable to the defendant. U.S. Sentencing Guidelines Manual § 2D1.1 n.12 (2003). "We review the district court's determination of drug quantities attributable to [the defendant] for clear error," United States v. Granados, 202 F.3d 1025, 1028 (8th Cir. 2000), and we will reverse "only if the entire record definitely and firmly convinces us that a mistake has been made." United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994).

Between January and July 2002, a period covered in the charged conspiracy, Mr. Bewig ordered 3,362 units of generic pseudoephedrine from the distributor. Each unit contains 24 pills. Each pill contains 60 milligrams of pseudoephedrine. Thus, during part of the charged conspiracy, Mr. Bewig ordered 4.841 kilograms of pseudoephedrine – more than five times the amount the distributor sold to any other company. Assuming that we treat all the sales of pseudoephedrine to the distributor's second leading purchaser as legal, and discount the purchases made by Mr. Bewig by that amount, reducing the total amount he ordered by one-fifth, we still end up with over 3.78 kilograms of pseudoephedrine – an amount in excess of the three-kilogram requirement of U.S. Sentencing Guidelines Manual § 2D1.11(d) for the base sentencing level of 38. Consequently, we cannot say that the District Court's approximation and assignment of offense level was clearly erroneous.

The defendant next argues that the District Court erred in imposing a two-level enhancement pursuant to U.S. Sentencing Guidelines Manual § 3B1.1(c) for Mr. Bewig's leadership role in the charged conspiracy. We again disagree.

To justify the leadership enhancement, a defendant need only have managed or supervised at least one other participant in the criminal conspiracy. United States v. Barrett, 173 F.3d 682, 684 (8th Cir. 1999). "[T]he enhancement may apply even if the management activity was limited to a single transaction." United States v. Garrison, 168 F.3d 1089, 1096 (8th Cir. 1999). The evidence presented at trial showed that Mr. Bewig was solely responsible for ordering pseudoephedrine from the distributor – a management activity. Further, on at least one occasion a station cashier sought and received permission from Mr. Bewig to sell pseudoephedrine to co-conspirator Mr. Combs and his wife in excess of the nominal three-unit limit – an

-9-

act of supervision.  Therefore, we can not say that the District Court erred in imposing a two-level enhancement for a leadership role in the charged conspiracy.

Affirmed.

_____