# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  03-2137
_____

United States of America,        *
                                      *

       Appellee,        *
                                      *

   v.            *
                                      *

Leo Adams,        *
                                      *

       Appellant.    *

Appeals from the United States
District Court for the
Eastern District of Missouri.

_____

No. 03-1305
_____

United States of America,     *
                                      *

       Appellee,     *
                                      *

   v.            *
                                      *

Carl Parker,      *
                                      *

       Appellant.    *

_____

Submitted: December 17, 2003
Filed: March 22, 2005

_____

Before MELLOY, McMILLIAN, and BOWMAN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Leo Adams and Carl Parker appeal from judgments entered in the District Court[1] for the Eastern District of Missouri after a jury found them guilty of conspiracy to distribute drugs, in violation of 21 U.S.C. §§ 841, 846. They challenge their convictions and sentences. We affirm Parker's conviction and sentence. We affirm Adams's conviction, but vacate his sentence and remand for re-sentencing.

## I. BACKGROUND

Adams, Parker, and thirteen other individuals, including Charles Rush-Bey, were indicted for their participation in a conspiracy to distribute heroin, cocaine, and cocaine base ("Rush-Bey conspiracy"). The government's case was developed through the use of informants, electronic surveillance, and searches of numerous locations. After the district court denied their pre-trial motions, the co-conspirators, except for Adams and Parker, pled guilty.

At the joint trial of Adams and Parker, the government established the existence of the conspiracy through numerous surveillance audio tape recordings of co-conspirators' telephone conversations, items seized pursuant to search warrants, and the testimony of law enforcement officers and co-conspirators. Robert Pruitt, a co-conspirator, identified speakers on surveillance tape recordings, noted that the speakers spoke in code in order "to elude a third ear on the phone," explained the meaning of certain words and phrases, and testified that the recordings were conversations of drug transactions. A government expert, after listening to a number

---

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

of the tape recordings, testified that the co-conspirators spoke in code and opined that the conversations indicated narcotics trafficking.

To establish Adams's and Parker's involvement in the conspiracy, among other things, the government introduced surveillance audio tape recordings of telephone conversations. In one of the tape recorded conversations, Rush-Bey told Parker that he had the license plate number of a person who needed to be "located." Parker told Rush-Bey that, because the person had a convertible, the job could be done "[l]ike President Kennedy." Parker noted that he had a "long shot glass" and "microscope."

On June 14, 2001, Parker arranged a three-way telephone conversation with himself, Rush-Bey, and Adams. Parker identified Adams, who had been shot in May 2001, as the individual with ".45s in him." After Parker told Adams that Rush-Bey was on the line, the conversation was as follows:

| | |
|---|---|
| Adams: | Yeah, man, my brother told me . . . you might be able to help me out, man. |
| Rush-Bey: | Yeah. |
| Adams: | Yeah, man, I sure appreciate that, man, you come talk to me. I'll tell you what I'm working with, you know what I'm saying? |
| Rush-Bey: | OK, Then, uh. |
| Adams: | It's safe over here, cause . . . we can get some type of relationship, you know we know each other, man. |
| Rush-Bey: | Right. Right. |
| Adams: | . . . I can leave my other people alone, man. You know what I'm saying? |
| Rush-Bey: | OK. |
| Adams: | We can talk about it, man. Cause you know, I be, you know how I be doing things, man. |
| Rush-Bey: | I understand . . . I understand. |
| Adams: | I can make it real . . . I ain't saying that it, you know, that it ain't already good but I be a good m******f***** in the clan, you know what I'm saying? |

-3-

Rush-Bey:    Right, right, right.  Set a time for however.
Adams:       All you got to do is (inaudible) tomorrow.

The jury also heard audio tape recordings of June 16, 2001, conversations between Rush-Bey and Adams, which indicated that Rush-Bey went to Adams's mother house, where Adams was waiting for him.

Ernest Williams, who had pled guilty to possession of heroin, testified that later in June 2001, pursuant to Adams's instruction, he went to Adams's mother's house and picked up 40 ounces of heroin, which Williams thought had come from Rush-Bey, put the heroin in the basement of an apartment that Adams had rented for him, and allowed Parker to sample it. After sampling a portion of the heroin, Parker told Williams it was of poor quality and to return it to Adams's son, which Williams did. The government's expert testified that in the June 14, 2001, conversation Parker had acted as the middleman in brokering a heroin deal between Adams and Rush. The expert also testified that 40 ounces was a distributable amount of heroin.

In addition to introducing evidence as to the charged conspiracy, the government introduced evidence relating to a heroin distribution conspiracy involving brothers Edward and Joseph Serrano ("Serrano conspiracy").[2] Randall Jackson, who pled guilty to being a member of the Serrano conspiracy, testified that from 1997 to 1999 Adams had purchased heroin from the Serrano brothers, who lived in Los Angeles, California. Jackson also testified that he and several women had made multiple round-trips for Adams between St. Louis and Los Angles to purchase heroin from the Serrano brothers and bring it back to St. Louis for resale. According to Jackson, Adams lost the Serrano brothers as a source of heroin in September 1999

---

[2]The Serrano investigation resulted in a thirteen-defendant indictment in the United States District Court for the Eastern District of Missouri. United States v. Aguilar-Sanchez, No. 4:01-CR-00450 (E.D. Mo. Oct. 25, 2001). Except for two fugitives, the defendants pled guilty.

because of a money dispute. Jackson identified Parker in the courtroom, but stated that he had had no dealings with him.

Leo Adams's brother, Will Adams, who also pled guilty to being a member of the Serrano conspiracy, testified that in December 1998 he saw Leo give money to the Serrano brothers. Will Adams also testified that in the late 1990s through 2001 he had obtained heroin from an individual in California named "Mario" and during that time had given Leo heroin four or five times and had received heroin from Leo twice. Will Adams stated that he had known Parker since the 1980s and that Parker had met him at his mother's house in May 2001 to inform him that Leo had been shot eight times with a ".45."

The government also introduced evidence obtained pursuant to search warrants. From the apartment Adams had rented for Williams, officers seized heroin and a gun. From Adams's bedroom in his mother's house, officers seized marijuana, a loaded shotgun, and ammunition. After his arrest, Adams told an officer that he was expecting a 200 or 300 ounce shipment of heroin from "Mario" and that he had received heroin from "Ed and Joe." He also admitted that he had bought heroin from Rush-Bey, but claimed that the price was too high.

As an officer executing the search warrant at Parker's home entered his bedroom, he saw Parker toss a pistol into a closet. In addition to seizing the pistol, which was a loaded 9-millimeter semiautomatic pistol, officers seized from the bedroom, a loaded magazine clip, two spiral notebooks, heroin, blenders with trace amounts of heroin, and baggies. An officer also seized from the bedroom a rifle scope and a cardboard silhouette of a human figure marked with "kill zones." The government's expert witness testified that the notebooks contained drug, weapons, and cash notations, which were indicative of mid-level drug distribution. A police officer also testified that in February 1986 he had executed a search warrant of Parker's home and seized blenders, heroin, a heroin cutting agent, notebooks with

drug notations, a handgun, and $9000.00 in cash. The officer also identified a document certifying that Parker had been convicted in June 1986 for possession with the intent to distribute heroin

The jury returned verdicts finding Adams and Parker guilty of conspiracy. Pursuant to the United States Sentencing Guidelines (U.S.S.G.), the district court sentenced Parker to 327 months imprisonment and Adams to 360 months imprisonment. These timely appeals follow.

## II. DISCUSSION

### A. PARKER

#### 1. Motion to Suppress

Parker argues that the district court erred in denying his motion to suppress, asserting that the affidavit submitted in support of the search warrant application contained false and misleading statements made knowingly or in reckless disregard of the truth, in violation of Franks v. Delaware, 438 U.S. 154 (1978). "We review the denial of a motion to suppress de novo, but review the underlying factual determinations for clear error, giving due weight to the inferences of the district court and law-enforcement officials." United States v. Coleman, 349 F.3d 1077, 1083 (8th Cir. 2003), cert. denied, 124 S. Ct. 2194 (2004).

In the affidavit, Christian Ebner, an agent with the Drug Enforcement Administration (DEA), stated: "[p]hysical and electronic surveillance reveals that this residence is utilized by Carl Parker for narcotics activity." Parker argues that the statement was false because Ebner testified at an evidentiary hearing that no one had observed narcotic activity taking place at the house. Contrary to Parker's argument, Ebner's statement was neither false nor misleading. In his affidavit, Ebner stated that surveillance established that Parker resided at the address and made very clear that electronic surveillance established that Parker was engaging in narcotic activity at the

house.  Ebner summarized several wire interceptions of telephone conversations of incoming calls to and outgoing calls from the telephone number assigned to the house, including conversations in which Parker agreed to broker a heroin sale with Rush-Bey and to act as an "enforcer" for the conspiracy. Contrary to Parker's argument, the intercepted telephone conversations established probable cause to believe that Parker was engaging in drug activity at the house.

Parker also asserts that the district court erred in admitting into evidence the rifle scope and cardboard silhouette of a human figure seized from his bedroom because the officers failed to list the items on a DEA form.  "However, he offers no supporting argument and citation, in violation of Fed. R. App. P. 28(a)(9)(A), and thus we do not address his assertion." United States v. Santos-Garcia, 313 F.3d 1073, 1081 (8th Cir. 2002) (Santos-Garcia).  Indeed, Parker fails to cite Fed. R. Crim. P. 41(f), which provides that an officer present at a search must prepare an inventory of seized items.  It also does not appear that Parker timely raised the issue in the district court. At trial, Parker only objected to the introduction of the evidence on the basis that it was more prejudicial than probative under Fed. R. Evid. 403.  Even if we were to review for plain error, there would be none.  Parker fails to suggest, much less prove, any prejudice resulting from the alleged failure to list the items on a property return. See United States v. Nichols, 344 F.3d 793, 799 (8th Cir. 2003) (suppression not required for violation of Rule 41(f) where defendant failed to establish prejudice).

## 2.  Sufficiency of the Evidence

Parker argues that the government failed to produce sufficient evidence supporting his conspiracy conviction. In reviewing this claim, "we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." United States v. Cabrera, 116 F.3d 1243, 1244 (8th Cir. 1997) (Cabrera).  We will reverse only if we conclude "that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." Id. at 1245 (internal

quotation omitted).  "To obtain a conviction for conspiracy, the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy."  Id. at 1244 (internal quotation omitted).  However, the government need not prove an express agreement.  Id. at 1245.  "[R]ather, the government need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [the defendant's] actions."  Id. (internal quotation omitted).  "[B]ecause the nature of conspiracy entails secrecy, the agreement and members' participation in it must often be established by way of inference from the surrounding circumstances."  Id. (internal quotation omitted).  In addition, "[o]nce a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement."  Id.

Contrary to Parker's argument, the government presented sufficient evidence to support his conspiracy conviction.  Indeed, ample evidence supports the verdict.  Among other things, the intercepted telephone conversations, including the June 14, 2001, conversation, and the items seized from Parker's home, including heroin, blenders, notebooks with drug and weapons notations, weapons, the cardboard silhouette of a human figure, and the rifle scope, establish that Parker knowingly agreed to participate in the Rush-Bey conspiracy.

### 3.  404(b) Evidence
Parker argues that the district court abused its discretion under Fed. R. Evid. 404(b) in admitting into evidence his 1986 conviction for possession with the intent to distribute heroin.  He concedes that evidence of prior drug convictions can be relevant under Rule 404(b) to prove, among other things, knowledge and intent.  He, however, asserts that the 1985 conviction was too remote in time to be probative of his knowledge or intent.  His argument is without merit.  "To determine if evidence is too remote, the court applies a reasonableness standard and examines the facts and

circumstances of each case." United States v. Franklin, 250 F.3d 653, 659 (8th Cir. 2001) (internal quotation omitted). An important circumstance in this case is that Parker had been incarcerated on the 1986 possession conviction from 1986 to 1997. Thus, "the number of years separating [Parker's] prior offense[] and the offense charged does not, as [Parker] suggests, significantly diminish the probativeness of the evidence because [he] had been out of prison for [only about four years] when the instant offense occurred." United States v. Roberts, 253 F.3d 1131, 1135 (8th Cir. 2001); see also United States v. Alaniz, 148 F.3d 929, 934 (8th Cir.1998) ("prior conviction was not too remote in time because [defendant] was incarcerated for almost the whole of the intervening period between that conviction and the indictment in this case"). The four-year interval is "well within the bounds of admission." United States v. Frazier, 280 F.3d 835, 847 (8th Cir. 2002) (Frazier) (noting "instances where 12, 13, and 17 years separated prior crimes found to be admissible").

Also, contrary to Parker's argument, the 1986 conviction for possession with the intent to distribute heroin was similar in kind to the charged offense. "We have held on numerous occasions that a prior conviction for distributing drugs, and even the possession of user-quantities of a controlled substance, are relevant under Rule 404(b) to show knowledge and intent to commit a current charge of conspiracy to distribute drugs." Id.

### 4. Severance

Parker argues that the district court abused its discretion in denying his Fed. R. Crim. P. 14 motion to sever his trial from that of Adams. Parker argues that he was prejudiced by the joint trial with Adams because of the spill-over effect of the testimony of Will Adams and Randall Jackson connecting Adams to the Serrano conspiracy, coupled with their in-court identification of him. His argument is without merit. "The general rule is that co-conspirators should be tried together." United States v. Kuenstler, 325 F.3d 1015, 1024 (8th Cir. 2003), cert. denied, 540 U.S. 1112 (2004) (Kuenstler). "Severance . . . is not required merely because the evidence may

have been more damaging against one appellant than [another]." Frazier, 280 F.3d at 844 (internal quotation omitted). Indeed, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro v. United States, 506 U.S. 534, 538-39 (1993). This is not the "rare case" where severance was required. Frazier, 280 F.3d at 844. Although Will Adams and Jackson identified Parker, neither implicated him in illegal activities. Jackson stated he had had no dealings with Parker. Will Adams testified that Parker had told him that his brother Leo had been shot, but did not suggest in any way that Parker was involved in the shooting. "Any concern that the evidence implicating [Adams prejudiced Parker] was minimized by the district court's instruction to the jury to view the evidence presented against [Adams] as applicable to only [Adams]." Id. Parker "has not shown that the court's limiting instructions were insufficient." Kuenstler, 325 F.3d at 1024.

### 5. **Sentencing**

Parker challenges his sentence of 327 months imprisonment, arguing that the district court misapplied the Sentencing Guidelines. Because Parker does not raise a Sixth Amendment argument on appeal, we do not consider whether United States v. Booker, 125 S. Ct. 738 (2005) (Booker) affects his sentence. "While [Parker's] failure to . . .  present . . . [a] Booker [error] prevents our review of [a] Sixth Amendment argument, we recognize that we are still obliged to apply a constitutional standard of review on appeal." United States v. Cramer, 396 F.3d 960, 965 n.4 (8th Cir. 2005) (Cramer). After Booker, "[w]e review the sentence imposed for unreasonableness, judging it with regard to the factors in 18 U.S.C. § 3553(a)." Id. at 965. Thus, in deciding whether a sentence is unreasonable, we will consider the applicable offense level, criminal history category, and the resulting guidelines range. 18 U.S.C.) § 3553(a)(4). We also will consider, among other things, the "nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), and the "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the

offense[,] to afford adequate deterrence to criminal conduct[, and] to protect the public from further crimes of the defendant."  Id. § 3553(a)(2).

The presentence report (PSR) calculated Parker's base offense level at 32, based on the jury's finding of a drug quantity of more than one kilogram but less than three kilograms of heroin.  The PSR recommended a two-point enhancement in the offense level for possession of a firearm under U.S.S.G. § 2D1.1(b)(1).  The PSR calculated Parker's criminal history as category III based on a 1983 conviction for possession of a firearm and the 1986 conviction for possession of heroin with the intent to distribute. The PSR noted four other adult felony convictions dating from 1974, which could not be counted under § 4A1.2 because they were more than fifteen years old. The guidelines range was 188 to 235 months imprisonment, but because the conspiracy involved more than one kilogram of heroin and Parker had a previous felony drug conviction, he was subject to a statutory minimum sentence of 240 months imprisonment under 21 U.S.C. § 841(b).

The government moved for an upward departure on the ground that a criminal history category of III significantly under-represented the seriousness of Parker's criminal history under U.S.S.G. § 4A1.3, noting the four convictions that could not be counted –a 1974 conviction for second-degree burglary, a 1975 conviction for stealing from a person, a 1976 conviction for first-degree armed robbery, and 1976 conviction for escape from custody involving an assault on a corrections officer–were crimes of violence.

At sentencing, the district court imposed the § 2D1.1(b)(1) enhancement, finding that the loaded pistol seized from Parker's bedroom closet had a connection to the drug conspiracy conviction.  The district court also granted the government's motion for an upward departure, concluding that category III significantly under-represented the seriousness of Parker's past crimes and the likelihood of recidivism. See § 4A.1.3 (departure warranted if criminal history category seriously under-

-11-

represents criminal history or "likelihood that the defendant will commit other crimes"). The district court stated that despite having served previous prison sentences, including 12 years on a 20 year sentence, "none of the earlier periods of incarceration ha[d] had the effect of deterring him from further criminal conduct." In determining the extent of the departure, the district court noted that if only two of the four convictions had been counted under § 4A1.3, Parker would have qualified for criminal offender status and a criminal history category of VI, which the district court believed best reflected the seriousness of Parker's past criminal conduct. The district court noted that category VI and an offense level of 34 resulted in a guideline range of 262 to 327 and sentenced Parker to 327 months imprisonment. The district court recognized the sentence was lengthy, but stated that it was necessary "as an effort to make sure that, at least for some period of time, the community would be safe from [Parker's] kind of behavior."

Parker argues that the district court incorrectly imposed the § 2D1.1(b)(1) two-level enhancement for possession of a firearm. He does not dispute that a loaded pistol was found in his bedroom along with heroin, baggies, cutting agents, blenders, a scale, and notebooks with drug and weapons notations, but argues that those facts did not support the district court's conclusion that there was a nexus between the gun and narcotics activity. He is mistaken. "The presence of these articles supports the conclusion that at least part of [Parker's] drug activities were conducted in that room, and that the gun was also used in connection with those activities." United States v. Moore, 212 F.3d 441, 447 (8th Cir. 2000).

Parker also asserts that the district court erred in granting the government's motion for an upward departure under § 4A1.3. Contrary to his argument, the district court did not base its departure on an impermissible factor. "The Guidelines expressly permit a district court to depart upward on the basis of convictions that are too old to receive criminal history points if the offenses[,]" as relevant here, "are dissimilar but serious offenses." United States v. Agee, 333 F.3d 864, 867 (8th Cir. 2003). Parker's

-12-

convictions for burglary, armed robbery, stealing from a person, and escape from custody are serious offenses. In addition, the convictions are "evidence of the likelihood of recidivism" since "they evince [Parker's] incorrigibility." Id. Also contrary to Parker's argument, in deciding the extent of the departure, the district court permissibly considered "the career offender range as an indicator of a reasonable sentence for someone with a criminal history as extensive as his." United States v. Flores, 336 F.3d 760, 765 (8th Cir. 2003). As the government points out, because Parker had been in prison much of the time between 1974 and the start of the conspiracy, "[i]t would seem that only incarceration had kept [Parker's] criminal history as low as category [III]." United States v. Washington, 109 F.3d 459, 462 (8th Cir. 1997).

In the circumstances of this case, we cannot say that the district court's sentence was unreasonable. See Cramer, 396 F.3d at 965-66 (holding § 4A1.3 upward departure was reasonable); United States v. Yahnke, 395 F.3d 823, 826 (8th Cir. 2005) (holding § 4A1.3 upward departure was reasonable). Indeed, in imposing the sentence, the district court expressly considered "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a).

## B. ADAMS
### 1. Sufficiency of the Evidence
Adams argues that the government failed to present sufficient evidence supporting his conspiracy conviction. He asserts that the evidence only showed that he was a one-time buyer of heroin from Rush-Bey. As previously discussed, in reviewing this issue, "we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." Cabrera, 116 F.3d at 1244. We will reverse only if we conclude that a reasonable juror must have had a "reasonable doubt about the government's proof of one of the offense's essential elements." Id. at 1245.

-13-

As Adams points out, "a mere sales transaction, standing alone, cannot support a conspiracy conviction." United States v. Bewig, 354 F.3d 731, 736 (8th Cir. 2003) (Bewig). "Our Circuit requires that there be some understanding beyond [a sales agreement] before the evidence can support a conviction for a conspiracy." Id. at 735 (internal quotation omitted). For example, "a sales transaction placed in context can [support a conspiracy conviction], if a reasonable person would impute a . . . conspiratorial agreement to the parties' actions and the circumstances surrounding the sales transaction." Id. at 736; see also United States v. Price, 258 F.3d 539, 545 (6th Cir. 2001) ("single sale can be sufficient to establish a conspiracy"); United States v. Rivera-Ruiz, 244 F.3d 263, 269 (1st Cir. 2001) ("single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller," may support conspiracy conviction) (internal quotation omitted); United States v. Fregoso, 60 F.3d 1314, 1323 (8th Cir. 1995) (Fregoso) ("independent evidence tending to prove that the defendant had some knowledge of the scope of the conspiracy, . . . along with the buyer-seller relationship, may be sufficient to support a conspiracy conviction") (internal quotation omitted).

Here, there was evidence of "some understanding beyond" a mere sales agreement. Bewig, 354 F.3d at 736. We have held that "[a] defendant's participation in a conspiracy is proven by evidence tending to show that the defendant shared a common purpose or design with his alleged coconspirators." United States v. McCoy, 86 F.3d 139, 141 (8th Cir. 1996) (McCoy) (internal quotation omitted). The government presented such evidence. In the June 14, 2001, telephone conversation with Parker and Rush-Bey, Adams told Rush-Bey: "I can leave my other people alone, man. You know what I'm saying?" Adams further stated: "I can make it real . . . I ain't saying what it, you know, that it ain't already good but I be a good m*****f****** in the clan, you know what I'm saying?" A reasonable juror could interpret Adams's remarks as showing that he was aware of the scope of the conspiracy, knowingly joined the conspiracy, and "shared a common purpose or design" with Parker and Rush-Bey. Id. In addition, the evidence that 40 ounces of

-14-

heroin was a distributable amount of heroin and that Adams was involved with Williams and Parker regarding the 40 ounces further supports a finding of Adams's knowing participation in the conspiracy to distribute drugs. See Fregoso, 60 F.3d at 1325 ("purchasing [drugs] for 'resale' is certainly one type of conduct upon which a conviction for conspiracy to distribute [drugs] may be obtained").

The fact that Adams returned the heroin because it was "no good" or that Rush-Bey's prices were too high does not negate the fact that Adams knowingly joined the conspiracy. See McCoy, 86 F.3d at 140 (rejecting defendant's argument that evidence was insufficient to support conspiracy conviction because the drug supplier refused to deal with buyer defendant had procured). Adams does not suggest, nor could he, that he had withdrawn from the conspiracy. "A cessation of activities, alone, is not sufficient to establish withdrawal from the conspiracy." United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003). Rather, "a defendant must demonstrate that he took affirmative action to withdraw from the conspiracy by making a clean breast to authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators." Id. (internal quotation omitted).

## 2. Instructions

Adams contends that the district court erred in refusing to give two proffered theory-of-defense instructions. "A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law." United States v. Hester, 140 F.3d 753, 757 (8th Cir. 1998) (Hester). The district court did not err in refusing to give Adams's proffered buyer-seller instruction. His instruction was modeled on a Seventh Circuit pattern instruction, which stated that "[t]he existence of a simple buyer-seller relationship between a defendant and another person, without more, is not sufficient to establish a conspiracy, even when the buyer intends to resell the [drug]." However, in this circuit, a buyer-seller instruction "does not apply to a defendant who received a large, distributable quantity of drugs." United States v. Montano-Gudino, 309 F.3d

501, 505-06 (8th Cir. 2002). In addition, as just discussed, based on the evidence presented no reasonable juror could have found that only a "simple buyer-seller" relationship existed between Adams and Rush-Bey.

Adams also argues that the district court erred in refusing to give a multiple-conspiracy instruction. He asserts that the 40 ounce heroin sale involving himself, Rush-Bey, Parker, and Williams was a separate conspiracy from the charged conspiracy. His argument is without merit. "[A] single overall conspiracy can be made up of a number of separate transactions and a number of groups involved in separate crimes or acts." United States v. Roach, 164 F.3d 403, 412 (8th Cir. 1998). In any event, "[i]f the evidence supports a single conspiracy, the failure to give a multiple conspiracy instruction is not reversible error." Id.

### 3. 404(b) Evidence

Adams argues that the district court abused its discretion under Fed. R. Evid. 404(b) in admitting evidence of his participation in the Serrano conspiracy. The government responds that the evidence of Adams's involvement in the Serrano conspiracy is not subject to a Rule 404(b) analysis because it was "inextricably intertwined" with the offense of conviction, reasoning that "Adams's falling out with the Serrano bothers [] precipitated his need to establish an on-going relationship with Rush-Bey." Appellee's Br. at 35. As the government notes, "crimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and Rule 404(b) does not apply." United States v. O'Dell, 204 F.3d 829, 833 (8th Cir. 2000). Adams responds that the evidence of his relationship to the Serrano conspiracy was not "inextricably intertwined" with the charged conspiracy because, according to the government's evidence, he had stopped dealing with the Serrano brothers in 1999, two years before he bought heroin from Rush-Bey. He also notes that the government's evidence showed that he had other sources of heroin.

In this case, we need not decide whether the evidence of Adams's participation in the Serrano conspiracy is "inextricably intertwined" with the charged conspiracy. We have observed that when it is "difficult to draw a line between the crime charged and other wrongful circumstances . . . the intrinsic-extrinsic dichotomy blurs and loses legal significance." United States v. Luna, 94 F.3d 1156, 1162 (8th Cir. 1996) (internal quotation omitted). In such a case, "[i]it matters little whether the evidence is viewed as lying beyond the scope of Rule 404, or as satisfying the test of Rule 404(b)." Id. (internal quotation omitted). This is so, because both Rule 404(b) evidence and evidence beyond the rule's scope are subject to the dictates of Rule 403, which requires that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice. Id.

For purposes of this opinion, we will assume that the district court admitted all the evidence relating to Adams's involvement in the Serrano conspiracy under Rule 404(b). Although Adams argues that the evidence of his participation in the Serrano conspiracy was inadmissible to prove motive, he concedes that under Rule 404(b) evidence of prior drug transactions is relevant to prove knowledge and intent to join the conspiracy. He, however, argues that the admission of the evidence was erroneous because the government could have admitted evidence of a 1988 arrest for possession of cocaine and heroin to prove his knowledge or intent, citing Old Chief v. United States, 519 U.S. 172 (1997). In Old Chief, the Supreme Court held that a district court abused its discretion in refusing a defendant's offer to stipulate to a prior felony conviction in an 18 U.S.C. § 922(g) felon-in-possession offense because the risk of prejudice outweighed the probative value of the evidence of the prior conviction. 519 U.S. at 174. However, this court has held that "Old Chief does not control a case where the prior [bad acts] evidence is offered to prove an issue which Rule 404(b) specifically permits to be proven by other crimes evidence, assuming the issue is relevant and subject, of course, to Rule 403 balancing." Frazier, 280 F.3d at 846-47. Because Adams concedes evidence of participation in other drug transactions is

relevant to show intent, "the admission of the past crime meets Rule 404(b) relevancy test." United States v. Hill, 249 F.3d 707, 713 (8th Cir. 2001).

Contrary to Adams's argument the probative value of the evidence of his involvement in the Serrano conspiracy is not substantially outweighed by the danger of unfair prejudice. "'Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis.'" United States v. Lupino, 301 F.3d 642, 646 (8th Cir. 2002) (quoting Rule 403 advisory committee note). We do not believe that the testimony was "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial." United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995) (internal quotation omitted). Moreover, the district court was careful to limit the witnesses's testimony as to unnecessary details and "instructed the jury as to the proper use of this evidence." Id.

Adams also argues that the district court should have excluded the testimony of Williams, Jackson, and Will Adams, asserting that their testimony was derived from electronic surveillance in the Serrano case, but that the government failed to comply with the ten-day notice requirement of 18 U.S.C. § 2518(9).[3] The government argues that because Adams was not a party to the intercepted conversations, he does not have standing to raise the issue. We do not resolve the standing issue, or any issue concerning an alleged violation of § 2518(9). Adams "offers no supporting argument and citation [to the authorities and parts of the record], in violation of Fed. R. App. P. 28(a)(9), and we thus do not address his assertion." Santos-Garcia, 313 F.3d at 1081. We also note that when the testimony was offered at trial, Adams objected on the basis of Rule 404(b), not on the basis of a violation of § 2518(9).

---

[3]The statute provides that evidence derived from wire interceptions "shall not be received in evidence . . . unless each party, not less than ten days before trial . . . has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved." 18 U.S.C. § 2518(9).

### 4. Indictment

Adams argues that the district court erred in denying his motion to dismiss the indictment based on prosecutorial misconduct before the grand jury. However, "[e]ven if we were to assume there was prosecutorial misconduct during the grand jury proceedings, the petit jury's guilty verdict rendered those errors harmless." United States v. Sanders, 341 F.3d 809, 818 (8th Cir.2003), cert. denied, 540 U.S. 1227 (2004).

### 5. Sentencing

On appeal, Adams argues that his 360-month sentence violated Apprendi v. New Jersey, 530 U.S. 466 (2000), an argument he also raised in the district court. In Booker, the Supreme Court "reaffirmed its holding in Apprendi: Any fact necessary (other than a prior conviction) necessary to support a sentence exceeding the maximum authorized by the facts established by a plea agreement or a jury verdict must be admitted by the defendant or proved to the jury beyond a reasonable doubt." 125 S. Ct. at 756. Because Adams preserved the Sixth Amendment issue for review, we vacate his sentence and remand for re-sentencing in accordance with Booker. See United States v. Fox, 396 F.3d 1018, 1027 (8th Cir. 2005).

## III. CONCLUSION

Accordingly, we affirm Parker's conviction and sentence. We affirm Adams's conviction, but vacate his sentence and remand for re-sentencing in light of Booker.

_____