# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-3296

_____

United States of America,

    Plaintiff - Appellee,

    v.

Maynard F. Brown,

    Defendant - Appellant.

_____

No. 05-3428

_____

Appeals from the United States
District Court for the Western
District of Missouri.

United States of America

    Plaintiff - Appellee,

    v.

David L. Deputy,

    Defendant - Appellant.

United States of America,                    *
                                             *
        Plaintiff - Appellee,                *
                                             *
v.                                           *
                                             *
Monty Camden,                                *
                                             *
        Defendant - Appellant.               *

_____

Submitted: March 13, 2006
Filed: August 29, 2006

_____

Before ARNOLD, JOHN R. GIBSON, and SMITH, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Maynard Brown, David Deputy, and Monty Camden were among nineteen defendants who were charged in a forty-nine count indictment that arose from the alleged diversion of pseudoephedrine by businesses in and around Forsyth, Missouri to individuals who used the pseudoephedrine to manufacture methamphetamine. Deputy appeals from his conviction following a jury trial, Brown appeals from the sentence imposed following his guilty plea, and Camden appeals from the denial of his motion to quash and to suppress evidence that preceded his conditional guilty plea. We affirm.

Deputy operated three related businesses from the same warehouse building in Forsyth, Missouri. The Castle was a retail operation that primarily sold drug paraphernalia items, and it was the focus of the two-year undercover investigation that concluded with these indictments. D & D Distributors was an entity Deputy formed for the purpose of obtaining a federal Drug Enforcement Administration license to distribute, on a wholesale level, products containing pseudoephedrine, ephedrine, and phenylpropanolamine. D & D supplied the pseudoephedrine pills that were purchased and found at The Castle during the investigation. Between May of 2000 and August of 2002, D & D ordered 5,142,528 pseudoephedrine pills. The third business, D-Mart, sold pseudoephedrine pills to Deputy's customers who wanted to purchase more than the maximum number of pills allowed by the DEA without a record being made of the sale.

When Deputy applied for the DEA license in 1999, the agency assigned a diversion investigator to review the application, meet with Deputy, and inspect the location in which the products were to be handled and stored. Deputy's application listed five convenience stores to which he intended to distribute the products, and he represented to the investigator that he expected sales of these products to make up less than ten percent of his total sales. The investigator saw no items of drug paraphernalia during her inspection of Deputy's building, and Deputy did not volunteer that he was planning to sell such items along with pseudoephedrine. The agency approved the application and issued the license.

The DEA investigator provided Deputy with copies of notices that informed him that pseudoephedrine is used illicitly to manufacture methamphetamine and advised him how to identify people who might be buying the product for that purpose. She also gave him a chart that listed the maximum number of pseudoephedrine pills that a distributor could sell in a month's time to individuals and to retailers without reporting the sale to the DEA. The DEA has no threshold requirement that limits how

-3-

much pseudoephedrine a distributor is permitted to sell; its requirements address only record-keeping and reporting.

In 2002, the DEA was scheduled to return to D & D to verify that it was meeting the legal requirements of the distributing license it held. However, the investigator learned that D & D was the subject of an ongoing criminal investigation and refrained from its regulatory inspection so as not to interfere. At the conclusion of the criminal investigation, the DEA gave Deputy the opportunity to surrender his license, and he did so.

The criminal investigation, which continued for nearly two years, was conducted by the COMET drug task force, or the Combined Ozarks Multi-jurisdictional Enforcement Team. Having received information that The Castle was selling large quantities of pseudoephedrine pills, members of the task force visited the business on October 25, 2001. They observed that The Castle was selling a variety of items including drug paraphernalia, plastic baggies commonly used for packaging controlled substances, smoking pipes, scales, urine test cleansing kits, knives, and pornography, along with pseudoephedrine. The Castle was identified as a head shop, a business that primarily sells drug paraphernalia. However, it also sold World War II memorabilia, including Russian army gas masks.

The officers purchased large amounts of pseudoephedrine at The Castle through more than a dozen undercover purchases. During these sales, Deputy often spoke of the limit on the number of pseudoephedrine pills that he could sell to an individual and expressed his preference for staying under the DEA reporting limit. He would also tell customers that he would not remember them if they returned the following day, thereby allowing the customers to purchase another month's limit of pills. He assured customers that the pills he sold were not wax coated and would dissolve easily. In addition, officers conducted trash pulls of the dumpster located on the south side of The Castle's parking lot and retrieved large numbers of empty blister

packs of pseudoephedrine with all the pills having been removed. According to a member of the task force, this commonly occurs to allow all the pills to be gathered in a single container as is necessary to cook methamphetamine. The dumpster also contained several envelopes which bore the words "pseudo pull" along with a dollar amount and a date, and bank deposit slips for The Castle.

The officers executed a federal search warrant for The Castle on October 17, 2002. During the search they seized approximately 460,000 pseudoephedrine pills with a note on the boxes indicating that they were waiting for a shipment back to Lannett, the drug manufacturer. The officers also learned that Deputy ran his three businesses out of this location: The Castle, D & D Distribution, and D-Mart. Records relating to D & D indicated that it was distributing pseudoephedrine to locations throughout southwest Missouri and northern Arkansas, including a laundromat and other head shops. Larry Crow was D & D's main salesperson.

D-Mart was located in the warehouse that housed Deputy's other businesses, but D-Mart had a separate entrance. Once certain customers purchased the limit of pills at The Castle (meaning below the reporting requirement), Deputy would advise them that they could exit the store and buy the limit again at D-Mart.

During the search, agents found a January 16, 2002 letter from the DEA advising Deputy that Missouri law forbids retail stores from selling more than the equivalent of three boxes of pseudoephedrine pills to a customer. They also discovered a May 23, 2000 agreement with Lannett, signed by Deputy, which limited the sale of its pseudoephedrine to 144 boxes per customer per month. According to Crow, Deputy told him he could sell up to four cases of pseudoephedrine per month per store, with each case consisting of 144 boxes of 48 pills, but he was to put each case on a separate invoice. Deputy told Crow he could sell one person more than four cases so long as the person had more than one business that could make separate purchases. Crow also testified that he prepared false invoices at Deputy's direction

for pseudoephedrine sales to a business named Good Earth Industries, but Deputy actually kept those pills for extra inventory.

One of the stores to which Crow sold pseudoephedrine was the Hilltop Store located in Isabella, Missouri, and operated by Maynard Brown. Members of the drug task force obtained a search warrant for the store and for Brown's residence and executed it on March 29, 2003. Brown was arrested the following day. Within days after his arrest, Brown threatened his relative and former employee, Missy Reichert, who was cooperating with the investigation. Six months later, Brown placed a message on a sign outside of his store that said, "I see you, Missy. I see you, too, Tony." Missy Reichert's husband is named Tony. Brown also followed the off-duty vehicle of an Ozark County deputy sheriff who had helped to obtain and execute the search warrant of his property. When the officer stopped Brown and asked why he was following him, Brown replied that he wanted the officer "to see what it felt like."

The investigation also revealed information that Brown distributed some of the pseudoephedrine he purchased to Monty Camden, who in turn provided it to others who used it to manufacture methamphetamine. Camden then brought methamphetamine back to Brown to sell at the Hilltop Store. An Ozark County narcotics investigator learned that heavy traffic frequented Camden's home, which was located on a rural road, and that Camden had recently had plumbers working to replace some pipes that had been burned out by heavy acid. Based on this information, the investigator attempted to visit Camden in his home to tell him that he suspected illegal activity and to ask for consent to search the property. When he arrived at the property, he first knocked on the door of the main house. Getting no answer, he continued around the house to a cabin. He knocked on its door and again got no answer. He observed an exhaust fan in a second floor window of the cabin and a number of sheds that were secured with heavy padlocks. The investigator then obtained and executed a search warrant for Camden's property. The search revealed

chemicals and precursors needed to manufacture methamphetamine along with white powder substance and residue that field tested positive for methamphetamine.

The investigation concluded with a forty-nine count indictment that named Deputy, Crow, Brown, Camden, and fifteen others. Two superseding indictments were filed, both of which added another defendant and one more count. Deputy went to trial and was found guilty on all nine of the counts on which he was charged: one count of conspiracy to distribute or possess three kilograms or more of pseudoephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture methamphetamine; two counts of distribution of pseudoephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture methamphetamine; one count of possession of pseudoephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture methamphetamine; one count of conspiracy to commit money laundering; and four counts of money laundering.[1] Deputy was sentenced to 240 months on each count, to be served concurrently. The jury also found some of Deputy's real and personal property subject to forfeiture under 21 U.S.C. § 853, namely the property that contained The Castle and cash in the amount of close to one million dollars, and the district court ordered the forfeiture of those items.[2] Deputy appeals from the judgment, arguing: there was insufficient evidence to support his conviction; the district court erred in failing to exclude expert testimony on the normal sales of pseudoephedrine; and the district court abused its discretion in instructing the jury.

Brown pleaded guilty to one count of conspiracy to distribute or possess three kilograms or more of pseudoephedrine, knowing or having reasonable cause to believe

---

[1]These nine counts were alleged to be in violation of 21 U.S.C. §§ 841(c)(2) and 846, 18 U.S.C. § 1956, and 18 U.S.C. § 1956(a)(1)(A)(i).

[2]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

that it would be used to manufacture methamphetamine, and was sentenced to 168 months' imprisonment. He appeals from a two-level enhancement of his sentence that the district court imposed for obstruction of justice.[3]

Camden entered a conditional guilty plea to one count of conspiracy to manufacture and distribute methamphetamine, reserving the right to appeal the district court's denial of his motion to quash a search warrant and to suppress evidence found in the search.[4] Camden was sentenced to thirty-seven months' imprisonment. On appeal, Camden raises only the suppression issue.

I.

Deputy argues that the district court erred in denying his motions for judgment of acquittal because the government failed to introduce evidence sufficient for the jury to find him guilty beyond a reasonable doubt on the possession, distribution, and drug conspiracy counts. He asserts that he was a lawful seller of pseudoephedrine who openly purchased the product and complied with the DEA's reporting requirements, that no evidence was introduced to show that methamphetamine was manufactured from the pseudoephedrine he sold, and that he was not part of a conspiracy. We review challenges to sufficiency of the evidence by examining the evidence in the light most favorable to the verdict and accepting all reasonable inferences which tend to support the jury's verdict. United States v. Exson, 328 F.3d 456, 460 (8th Cir. 2003). We do not weigh the evidence or assess the credibility of the witnesses. Id.

---

[3]Id.

[4]Id., adopting the report and recommendation of the Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

This court has recently had numerous occasions to discuss attacks on the sufficiency of the evidence in cases involving the possession and distribution of pseudoephedrine with the knowledge, or with reasonable cause to believe, that it will be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c). For example, in United States v. Bewig, 354 F.3d 731 (8th Cir. 2003), we determined that a reasonable jury could have concluded that Bewig entered into a conspiracy to violate § 841(c) because of certain key facts. First, we noted that pseudoephedrine has limited legal uses, and that "if you do not have a cold, a headache, or sinus problems there are remarkably few things you can do with pseudoephedrine except make illegal narcotics." 354 F.3d at 736. Bewig's sales of pseudoephedrine to routine customers, and in bulk, suggested that he was acting merely as a front to an organized drug scheme. Second, Bewig knew that pseudoephedrine was used to make methamphetamine. Third, Bewig's distributor informed him that he was ordering pseudoephedrine at a disproportionately high rate, which suggests agreement in the illegal endeavor as a conspirator who promoted the venture with a stake in the outcome. Fourth, Bewig sold the pseudoephedrine in amounts larger than his limit or to the same person over the course of a day in multiples of the limit. Taken together, these facts led us to conclude that Bewig could not "defeat his conviction by hiding behind an unreasonable veil of ignorance." Id. at 736-37. See also United States v. Frazier, 408 F.3d 1102 (8th Cir. 2005), cert. denied, 126 S. Ct. 1165 (2006) (rejecting the argument that defendant's constructive possession of pseudoephedrine was insufficient evidence of his knowledge that it would be used to manufacture methamphetamine).

We likewise reject Deputy's challenge to the sufficiency of the evidence. While we have made it clear that "section [841(c)(2)] does not punish the inadvertent sale of a listed chemical to an illegal drug manufacturer, but instead punishes only those sales where the seller understands, or should reasonably understand, that the chemical will be used illegally," United States v. Sdoulam, 398 F.3d 981, 988 (8th Cir. 2005) (quoting Bewig, 354 F.3d at 737), the evidence here strongly supports the jury's

finding. Deputy knew that pseudoephedrine is used to make methamphetamine, and investigators found large quantities of empty blister packs dumped in trash receptacles outside The Castle. Deputy operated two retail businesses out of the same building, thereby allowing his customers to buy twice the number of tablets during each purchase. His distribution business, D & D, had a variety of customers that are not traditional vendors of cold and sinus medication. Deputy advised his D & D salesman, Crow, how to make it look like he was not exceeding the limit of sales per customer by pretending that various businesses were unrelated, and Deputy himself would assure customers that he would not remember them if they returned the following day. The evidence in this case was overwhelmingly sufficient to establish the elements of the substantive charges of distribution and possession.

This same evidence likewise causes us to reject Deputy's challenge to the sufficiency of the evidence with respect to the drug conspiracy charge.[5] The government is not required to prove an express understanding between the conspirators, but "need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [the defendant's] actions." Bewig, 354 F.3d at 735. Deputy had tacit understandings with Crow about the quantity of tablets he could sell and to whom, and with his retail customers about the quality and quantity of the tablets he distributed. The district court did not err in denying Deputy's motion for judgment of acquittal.

---

[5]Deputy includes a challenge to the sufficiency of the evidence on the money laundering counts in the heading of his argument, but he never addresses those counts in the body of his brief. There was sufficient evidence that Deputy made money by selling pseudoephedrine and that he promoted his illegal distribution scheme with that money, see United States v. Jenkins, 78 F.3d 1283, 1288 (8th Cir. 1996), and we reject his challenge.

-10-

## II.

Deputy asserts that the district court erred in denying his motion to exclude the testimony of an expert witness concerning the normal or expected sales of pseudoephedrine by a traditional convenience store. Although he acknowledges that the subject matter of the witness's testimony was admissible under United States v. Sdoulam, 398 F.3d 981, 988-91 (8th Cir. 2005), Deputy argues that the witness should not have been allowed to testify because his opinions were based on insufficient facts and data,[6] and that furthermore his testimony was irrelevant and unfairly prejudicial. We review the district court's decision to admit expert testimony for abuse of discretion. Id. at 989.

Deputy complains that the witness had not visited any of the stores that D & D serviced and that he had no information about their location, size, condition, and operations. However, the witness's testimony was based on comparing sales at these stores to data obtained from a national economic census regarding estimated national pseudoephedrine sales figures. The census information is precisely what we approved in Sdoulam, and the sales figures came from invoices seized from D & D to which Deputy posed no objection. Deputy's assertion of unfair prejudice in the admission of the testimony is unsupported by any argument, and he has failed to demonstrate that the district court abused its discretion.

---

[6]Deputy argues in his brief that the witness lacked the necessary educational background in the field of statistics, but he failed to raise that argument before the district court. Deputy's counsel raised the witness's lack of academic degree in the field of statistics in cross-examination as a challenge to the weight of his testimony, but made no objection to its admissibility on that ground. We therefore review it for plain error. Fed. R. Crim. P. 52(b). Deputy has not demonstrated that the district court committed such error in finding the witness's educational background sufficient.

-11-

III.

Deputy asserts that the district court abused its discretion by giving the jury a permissive inference instruction that allowed the jurors to infer that Deputy had reasonable cause to believe that the pseudoephedrine he sold would be used to manufacture methamphetamine if the jurors found that he sold excessive amounts of pseudoephedrine. Deputy asserts that the instruction was not warranted because the district court had already agreed to give an instruction on knowing and deliberate ignorance, and an additional permissive instruction was prosecutorial overkill. We review the challenge for abuse of discretion, United States v. Phelps, 168 F.3d 1048, 1057 (8th Cir. 1999), and we will uphold the instruction if it is a correct statement of the law and supported by the evidence. United States v. Sdoulam, 398 F.3d 981, 993 (8th Cir. 2005).

The challenged instruction is nearly identical to one we approved in Sdoulam, except that the instruction in this case also permitted an inference of knowledge or reasonable cause to believe if the jurors found beyond a reasonable doubt that Deputy "sold abnormally large amounts of pseudoephedrine as a wholesaler to customers not traditionally associated with the legitimate sale of pseudoephedrine." However, because the addition of these words was supported by the evidence and the instruction remains a correct statement of the law, the instruction was proper. See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc., 125 F.3d 1176, 1180 (8th Cir. 1997).

We affirm the judgment as to Deputy.

IV.

Maynard Brown appeals a single sentencing issue. Brown pleaded guilty to one count of conspiracy to distribute three kilograms or more of pseudoephedrine,

knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine, and was sentenced to 168 months' imprisonment. The plea agreement included a stipulation to a base offense level of 32 with a two-level increase for possession of a dangerous weapon, another two levels for a leadership role, and a three-level reduction for acceptance of responsibility, with a net offense level of 33.

The presentence investigation report recommended a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. The district court adopted the recommendation following an evidentiary hearing, concluding that the evidence raised the inference of a threat. The district court denied Brown's objection to the enhancement, and Brown argues that the preponderance of the evidence did not support the court's finding.[7] We review the district court's factual findings for clear error. United States v. Willey, 350 F.3d 736, 738 (8th Cir. 2003).

The Ozark County deputy sheriff who arrested Brown spoke with Missy Reichert and her husband Tony less than one week after the arrest as part of the ongoing investigation. The Reicherts had recently lived next to the Hilltop Store that Brown operated and Missy had worked there. They told the deputy that since his arrest, Brown had been looking for them where they had relocated in Arkansas and had threatened to kill them. The day after this conversation, the same deputy was driving in Ozark County and noticed that Brown's vehicle was following him. He stopped on a road that he knew was a dead end and got out of his vehicle to enter the woods. Brown stopped briefly by the deputy's vehicle and then continued driving

---

[7]The government did not agree to the enhancement as part of the plea agreement and ostensibly took no position on it at the hearing. However, the government attorney offered to and did conduct a direct examination of the officer who was involved in each of the incidents upon which the district court's finding was based.

towards the dead end. The deputy returned to his vehicle, stopped Brown at the dead end, and checked him for weapons. He asked Brown why he was following him, and Brown replied that he wanted the deputy "to see what it felt like."

Approximately five months later, the deputy noticed a large illuminated sign sitting next to the Hilltop Store's driveway. The sign listed items for sale but also read, "I see you, Missy. I see you, too, Tony." The district court's conclusion that Brown's conduct constituted an implied threat to the Reicherts is not clearly erroneous.

Brown also argues that § 3C1.1 requires that the obstructive conduct take place when the defendant knows that an investigation of the instant offense is underway, and that he had no such knowledge. We review de novo the application of the guidelines to the facts. Willey, 240 F.3d at 738.

The guidelines describe obstructive behavior to include "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, comment. n. 4(a). Brown correctly asserts that the guideline requires obstructive conduct to have occurred during the course of the investigation related to the offense of conviction and not at any other time. United States v. Stolba, 357 F.3d 850, 852-53 (8th Cir. 2004). He admits that he knew that a state investigation for possession of methamphetamine was underway but he denies that he had any knowledge of a federal investigation. This distinction is irrelevant under the guideline, as the state investigation involved a closely related offense. See United States v. Adediran, 26 F.3d 61, 64-65 (8th Cir. 1994). The district court correctly interpreted the guideline.

We affirm Brown's sentence.

-14-

V.

Camden appeals from the district court's denial of his motion to quash a search warrant and to suppress evidence found in that search. He asserts that the affidavit used to obtain the warrant lacked probable cause and contained knowingly made material misrepresentations and omissions. We review the district court's findings of fact for clear error and its conclusions of law de novo. The existence of probable cause is a mixed question of fact and law which we review de novo. United States v. Velazquez-Rivera, 366 F.3d 661, 664 (8th Cir. 2004).

The affidavit in question was prepared by Ozark County Deputy Sheriff David Holmes, a member of the drug task force. During the course of his investigation, Holmes obtained information from an informant that Camden was supplying methamphetamine to Brown in return for pseudoephedrine tablets. At the time Holmes obtained this information, Brown had recently been arrested for manufacturing methamphetamine. The informant said that Camden drove a beer delivery truck and made weekly stops at the Hilltop Store. After talking with the owner of the beer distributorship, one of Camden's neighbors, and another informant, Holmes went to Camden's house to speak with him. No one responded to his knocks on the door of the house or of another cabin located on the property. While there, Holmes noticed the windows of the cabin were blocked and an exhaust fan was installed in a second floor window. He saw several windowless, padlocked outbuildings and a five-gallon jug of what he identified as muriatic acid on the front porch of the house. In his affidavit, Holmes wrote that muriatic acid is used in the manufacture of methamphetamine although its intended use is to clean cement. He saw no cement on Camden's property. Based on the information in the affidavit, the Ozark County prosecutor obtained a search warrant for Camden's property and all of the buildings located on it. The search revealed chemicals and precursors needed to

-15-

manufacture methamphetamine along with white powder substance and residue that field tested positive for methamphetamine.

Camden asserts that the affidavit failed to establish probable cause because it did not establish a nexus between what it alleged to be Camden's drug activity and his property. The affidavit stated that a jug of muriatic acid was located on the porch, but during cross-examination Holmes admitted that the jug was marked as "acid" and he believed but did not know it to be muriatic acid at the time. Camden further argues that other details in the affidavit were unclear, confusing, and insignificant. The magistrate judge found that the affidavit contained sufficiently reliable and detailed information, both from informants and resulting from Holmes's corroborating efforts, to establish probable cause. We have reviewed the record and conclude that the circumstances set forth in the affidavit, including the veracity and basis of knowledge of those who supplied hearsay information, produced a fair probability that contraband would be found on Camden's property. See United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The district court did not err in adopting the magistrate judge's finding of probable cause.

Camden also challenges the district court's finding that the affidavit did not contain deliberate or reckless misrepresentations and omissions of material facts that would invalidate the search warrant and exclude the fruits of the search under Franks v. Delaware, 438 U.S. 154, 155-56 (1978). Camden lists five erroneous factual statements: 1) the affidavit stated that the jug on the porch contained muriatic acid when Holmes did not know the identity of its contents with certainty; 2) Holmes implied that the gallon contained five gallons without knowing the amount in it; 3) the affidavit did not clearly state whether plumbing had been replaced because acid had been poured down the drain of the house or the cabin; 4) Holmes did not recite the distance between the house and the cabin, which is two-tenths of a mile; and 5) the

-16-

affidavit stated that there was no cement visible at the house, but there was in fact concrete.

The complaints Camden sets forth are more akin to discrepancies than to misrepresentations or omissions. However, even assuming that any of them fall into the latter category, there would be no <u>Franks</u> violation unless Camden shows that Holmes misrepresented the information or made false statements with the intent to make, or in reckless disregard of whether it made, the affidavit misleading. <u>United States v. Allen</u>, 297 F.3d 790, 795 (8th Cir. 2002). Camden has made no effort to make such a showing. In addition, if information had been intentionally or recklessly misrepresented, Camden would have to prove that the affidavit would not support a finding of probable cause without those statements. <u>Id.</u> The record does not support any such conclusion.

The district court did not err in denying Camden's motion to quash the search warrant and to exclude evidence uncovered pursuant to execution of the warrant.

We affirm the district court as to all issues with respect to Deputy, Brown, and Camden.

_____