# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-1632

———————

United States of America,

        Appellee,

v.

Roy James Hudspeth,

        Appellant.

\* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
Western District of Missouri.

———————

Submitted: December 12, 2007
Filed: May 19, 2008

———————

Before RILEY, COLLOTON, and BENTON, Circuit Judges.

———————

BENTON, Circuit Judge.

A jury convicted Roy James Hudspeth of conspiracy to distribute pseudoephedrine in violation of 21 U.S.C. §§ 841(c)(2) and 846, conspiracy to launder money in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h), and two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Hudspeth argues the district court[1] erred in denying his motions to suppress and motions for judgment of acquittal, and in providing four jury instructions. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

———————

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

I.

This court states the facts in a light most favorable to the jury's verdict. *See*
*United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008).

Hudspeth was vice-president and chief managing officer of Handi-Rak, Inc., in
Brookline, Missouri. In 1997, on behalf of Handi-Rak, Hudspeth applied for a List
I chemical license with the Drug Enforcement Administration (DEA). As part of the
registration, two DEA agents met with him to discuss recordkeeping, the dangers of
diversion of pseudoephedrine and ephedrine products,[2] and the importance of knowing
the customer base. The DEA agents also told Hudspeth that he was responsible for
making sure that Handi-Rak complied with the law. Hudspeth acknowledged these
obligations, volunteering that the sale of pseudoephedrine and ephedrine products
would be less than one percent of his sales. Handi-Rak subsequently received a List
I chemical license.

Hudspeth met with the DEA again in April 2002. The DEA inspected Handi-
Rak for compliance with the regulations on the distribution of List I chemicals. The
DEA agent was particularly concerned with the fact that: (1) Hudspeth knew of only
four pseudoephedrine or ephedrine products although Handi-Rak sold more than 180
products with at least one as an ingredient; (2) Hudspeth estimated that the sale of
these products represented about 30 or 40 percent of Handi-Rak's business; (3)
Hudspeth set a 48-box limit per week per product, but customers repeatedly received
more than this self-imposed limit; and (4) salesmen submitted handwritten invoices
with no information about which customers bought the boxes of these products and

---

[2]The DEA agent testified, she told Hudspeth, "Diversion of these products is
having knowledge or reasonable cause to believe that they're being diverted to
manufacture methamphetamine. It can be based upon suspicious orders by the
customers. It can be based upon quantity of sales. It can be based upon just general
customer base."

how much they bought. The DEA agent expressed her concerns to Hudspeth. She also provided him with a "Red Notice," warning that pseudoephedrine and ephedrine products were being seized at meth laboratories, that suspicious orders should be immediately reported to the local DEA office, and that any person distributing or possessing these products with knowledge or reasonable belief that they will be used to manufacture a controlled substance is in violation of 21 U.S.C. § 841(d)(2). The DEA agent also gave Hudspeth a "Chemical Handler's Manual." The manual included the "Suspicious Task Force Form," listing things to look for to stop diversion. The list includes: "Customers who push to buy more than your sales limits," "Customers who repeatedly buy your sales limit at the shortest interval you set," "Customers who resell to nontraditional outlets of regulated over-the-counter products," "Customers who buy only the largest size available," and "Customers that don't sell other pharmaceutical products or appear to sell those other products in token amounts." Examples of nontraditional outlets are "hair salons, head shops, [and] drug paraphernalia stores . . . ."

Search warrants were executed at Handi-Rak on May 22, 2002, and July 24, 2002, as part of a criminal investigation by the Combined Ozarks Multi-Jurisdictional Enforcement Team. At the May search, officers discovered numerous handwritten invoices in Hudspeth's desk, which listed large amounts of pseudoephedrine products, some in excess of 144 boxes, being checked out to salesmen with no other information provided. The officers questioned Hudspeth about the invoices. He stated that "pseudoephedrine was a popular product and that the salesmen would check out extra pseudoephedrine and carry it on the truck with them in case they came along somebody that they wanted to sell it to." The officers also talked to Hudspeth about their suspicions that one of Handi-Rak's customers diverted pseudoephedrine to meth manufacturers. Hudspeth replied that "it really wasn't his responsibility."

In the July search, officers inventoried all the pseudoephedrine and ephedrine products at Handi-Rak. Again, officers questioned Hudspeth about Handi-Rak's business practices and suspicions about specific customers diverting the product to

-3-

meth manufacturers. Hudspeth answered that "he really didn't know what the business practices of his customers were, that it really wasn't his responsibility on whether or not they were using or misusing the product or how they were using the product." With regard to specific stores, he claimed that "that wasn't his responsibility." The officers asked why his customers would want to purchase such large amounts of pseudoephedrine. Hudspeth replied that "he didn't know that they were making the drug . . . methamphetamine." Officers also asked why Hudspeth was not turning in his customers who were purchasing large amounts of pseudoephedrine. He responded that "if he turned in every customer that he thought was misusing the pseudoephedrine product, that he wouldn't have any customers left."

After these events, Handi-Rak continued to sell large amounts of pseudoephedrine and ephedrine products to customers until November 2003.

Mike Williams, a salesman, testified that he delivered large amounts of pseudoephedrine and ephedrine products to The Castle. The Castle was a "head shop" in southwest Missouri, which primarily sold drug paraphernalia. Williams delivered once or twice a week the maximum amount of pseudoephedrine and ephedrine products. However, Williams was concerned about the store because it was a head shop; he believed the store was diverting the products to manufacture meth. Williams said that he talked pretty often with Hudspeth about his concerns, but Hudspeth said, "Not to worry," and "Go ahead and sell it." Williams stopped delivering to The Castle in June 2002 after the store asked for iodine, which is also used to manufacture meth. Williams also said that after the second search warrant was executed, another salesman told Hudspeth about a store that wanted to buy 48 boxes of pseudoephedrine. Hudspeth told the salesman, "I didn't hear that," and "Don't talk about that."

Troy Kelly, a salesman, delivered large amounts of pseudoephedrine to the C&M Country Corner, a little mom-and-pop store in southern Missouri. He testified Hudspeth told him how to get around the 48-box limit by making hand tickets, or

written invoices. Kelly would take extra product with him and sell it to customers who wanted more boxes or did not order any. He would write out an invoice for the sale and then turn it in with the regular invoices. Kelly also testified that he talked to Hudspeth about selling extra pseudoephedrine to C&M. Hudspeth told him, "With them we sell everything we can sell to them," and "Pills are profit." C&M's owner told Kelly that she thought customers were buying the pseudoephedrine to manufacture meth. Kelly told Hudspeth, who responded: "what she does with it after the fact is her business, not ours." Kelly continued to sell pseudoephedrine to C&M.

Michael Higgins, a salesman, delivered large amounts of ephedrine products to two Quick Stop convenience stores in the Kansas City area. He delivered weekly the maximum amount of ephedrine products. Higgins, though, testified that there was no limit on the amount he could deliver until September 2002. Higgins also stated that he developed suspicions about the Quick Stop stores because they were selling a lot more ephedrine than any other store he delivered to. However, Higgins did not discuss his concerns with Hudspeth.

Handi-Rak's bookkeeper testified she was concerned with the handwritten invoices, which were primarily for pseudoephedrine products. She expressed her concerns with Hudspeth, but he would tell her not to worry about it. Another Handi-Rak employee also testified that she told Hudspeth about the salesmen checking out more pseudoephedrine than the 48-box limit. Hudspeth said he would take care of it. All employees indicated that pseudoephedrine and ephedrine products were Handi-Rak's biggest sellers and that the 48-box limit was repeatedly ignored.

An expert testified that a convenience store would be expected to sale $19.76 per month of pseudoephedrine, according to national averages. A non-convenience store, such as a head shop, would not be expected to sell any pseudoephedrine. In comparison, Handi-Rak's average monthly sales of pseudoephedrine to The Castle were $957.05, to C&M were $700.48, and to the Quick Stops were $581.19. Several

other stores that Handi-Rak serviced also purchased similar amounts of pseudoephedrine products.

Multiple police officers testified about their investigation of Handi-Rak. Several undercover officers purchased large amounts of pseudoephedrine from The Castle. The officers matched the lot numbers of these boxes to lot numbers sent to Handi-Rak from Cumberland Swan, a distributor of health and beauty products, including pseudoephedrine and ephedrine products. A representative from Cumberland Swan testified that at that time its only customer in Missouri was Handi-Rak (although it had two customers in Arkansas).

Officers also testified about their investigation of the Pit Stop and Norm's Grocery Store, both serviced by Handi-Rak. Officers searched the property of the manager of the Pit Stop, finding pseudoephedrine tablets in an abandoned refrigerator. The lot numbers on those boxes matched the lot numbers of pseudoephedrine shipped to Handi-Rak from Cumberland Swan. Officers also seized boxes of pseudoephedrine from Norm's Grocery Store, after a clerk contacted the state patrol about suspicious deliveries of pseudoephedrine. The lot numbers on those boxes also matched the lot numbers shipped to Handi-Rak from Cumberland Swan.

The first trial ended in a mistrial; the jury was unable to reach an unanimous verdict. Before the second trial, Hudspeth moved to suppress the search warrants. The district court denied the motion as untimely and alternatively found sufficient probable cause for the warrants. The jury convicted Hudspeth of conspiracy to distribute pseudoephedrine, conspiracy to money launder, and two counts of money laundering. He was sentenced to concurrent terms of 240 months on each count of conviction.

II.

In reviewing the district court's denial of a motion to suppress, this court reviews findings of fact for clear error and legal conclusions de novo. *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007), *cert. denied*, 76 U.S.L.W. 3510 (U.S. Mar. 24, 2008) (No. 07-8356). Specifically, this court reviews de novo the district court's determination of probable cause and application of the *Leon* exception. *Id.*; *see generally United States v. Leon*, 468 U.S. 897 (1984).

"If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *Grant*, 490 F.3d at 631, *citing Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted). "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts." *Grant*, 490 F.3d at 632. "Where there is no evidentiary hearing before the magistrate judge, the probable cause determination must be based upon 'only that information which is found within the four corners of the affidavit.'" *United States v. Olvey*, 437 F.3d 804, 807 (8th Cir. 2006). The affidavit for a search warrant should be examined using a common sense approach, and not a hypertechnical one. *Grant*, 490 F.3d at 632.

The May search warrant was a Missouri state warrant. The attached affidavit indicated:

- Pseudoephedrine is a main precursor used to manufacture meth, and is commonly purchased in the form of over-the-counter cold and sinus medicines.

- A business, store, or distributor of pseudoephedrine-based cold tablets is required to keep records and limited by Missouri Statute to the sale of three boxes of pseudoephedrine-based cold medications to any person.

- Undercover officers made several large purchases of pseudoephedrine at The Castle in March and April 2002. The Castle sold officers more than the legal state limit of 66 tablets per purchase.

- While there to purchase, officers overheard a conversation between Williams, a Handi-Rak salesman, and the owner. Williams informed the owner that Aleve was going to be releasing a 120-milligram pseudoephedrine-based cold tablet, that the DEA was investigating Handi-Rak, and that he needed to buy some chemicals to clean his system, "since he was afraid that with law enforcement at the warehouse he might be asked to take a drug test."

- A burglary occurred at Handi-Rak on March 19, 2002, with 77,760 pseudoephedrine-based cold tablets stolen, along with 530 packages of lithium batteries. Officers believed a Handi-Rak employee was involved in the burglary because nothing else was taken, doorways inside the business were not forced, and the suspects apparently knew the exact location of the pseudoephedrine.

- Officers received records from Cumberland Swan Company with the lot numbers of every box of pseudoephedrine-based cold tablets purchased from The Castle. The records indicated that the lot numbers corresponded with boxes shipped to Handi-Rak.

- Louie Burton,[3] a sales manager of Handi-Rak, has been selling pseudoephedrine-based cold tablets to various businesses without sales receipts or paperwork in order to conceal the large amounts of pseudoephedrine cold tablets sold by Handi-Rak.

The July search warrant was a federal search warrant. The attached affidavit indicated:

- A description of head shops and regional distributors. Specifically, it noted that regional distributors may willfully ignore the excessive sale of precursors at head shops, or may actively encourage the sale of the precursors because of the profitability of sales, and that regional distributors are required by the DEA to keep records and maintain books relating to the transportation, ordering, and/or distribution of precursors.

- A reiteration of the facts from the May search warrant.

- A description of the evidence seized from the May search warrant, including the discovery of several handwritten invoices in Hudspeth's desk, showing numerous boxes of pseudoephedrine with a date and a salesman's name, but no customer information.

- A description of interviews with Bunch, Kelly, and Williams, salesmen for Handi-Rak. Each salesman admitted selling more than the 48-box limit to customers by filling out handwritten receipts, which were given

---

[3]The May affidavit says Burton, but later evidence and the July affidavit demonstrate his surname is Bunch. A minor clerical error does not invalidate the search warrant. *See* **United States v. Thomas**, 263 F.3d 805, 808-09 (8th Cir. 2001); **United States v. Carlson**, 697 F.2d 231, 238 (8th Cir. 1983) (ruling an unintentional mistake on the part of an officer applying for a search warrant in and of itself will not render a warrant invalid).

to Hudspeth and kept at the Handi-Rak warehouse. Kelly further stated most of the salesmen conducted business in this manner at Handi-Rak and that Hudspeth allowed it. Williams also declared that he thought the stores that obtained large amounts of pseudoephedrine were probably selling it to customers who use it to manufacture meth.

• A description of an interview with the owner of C&M Country Store. She explained that she bought the 48-box limit of pseudoephedrine from Handi-Rak via the computer-generated receipts and bought extra pseudoephedrine from Handi-Rak via the handwritten receipts. She confessed to selling large amounts of pseudoephedrine to customers who she knew were using it to manufacture meth.

• A description of several undercover purchases of pseudoephedrine at stores serviced by Handi-Rak.

Hudspeth asserts there was no probable cause to issue the May and July search warrants. He also claims the affidavit attached to the July search warrant was based on evidence obtained illegally in the May search, requiring that the July search warrant be evaluated without consideration of the May evidence.

Looking only within the four corners of the affidavits and using a common sense approach, there was probable cause for the May and July search warrants. Probable cause requires only a showing of fair probability, not hard certainties. *See Gates*, 462 U.S. at 231. Here, the affidavits demonstrate a fair probability of finding evidence of a crime at Handi-Rak and its warehouse. Thus, the search warrants are valid. *See United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006) (search warrant is valid under the Fourth Amendment if it establishes probable cause). Moreover, because the May search was legal, the July search warrant properly referenced evidence obtained from that search.

However, even if there was no probable cause to issue the search warrants, the *Leon* good-faith exception applies here. "Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." **Grant**, 490 F.3d at 632. "In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit, and we confine our inquiry to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." **Id.** (internal quotation marks and citations omitted). Here, based on the affidavits, a reasonably well-trained officer would not have known that the search was illegal despite the issuing judges' authorization.

The district court did not err in denying the motions to suppress.

III.

This court reviews de novo the denial of a motion for judgment of acquittal, viewing the evidence most favorably to the verdict. **United States v. Santoyo-Torres**, 518 F.3d 620, 623 (8th Cir. 2008). This court will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. **Id.**; *see also* **United States v. Reddest**, 512 F.3d 1067, 1069-70 (8th Cir. 2008) (there is "no meaningful distinction between the *de novo* standard used to review the sufficiency of the evidence to support a guilty verdict and the *de novo* standard used to review the district court's ruling on a defendant's motion for judgment of acquittal").

Hudspeth insists there was insufficient evidence to convict for conspiracy to distribute pseudoephedrine, conspiracy to commit money laundering, and money laundering. Specifically, Hudspeth asserts there was no evidence of an agreement or

any understanding between the conspirators, and no evidence that the financial transactions were conducted with the intent or knowledge to promote a specified unlawful activity.

To convict for conspiracy, the government must prove beyond a reasonable doubt: (1) an agreement among two or more people to achieve an illegal purpose, (2) Hudspeth's knowledge of the agreement; and (3) that Hudspeth knowingly joined and participated in the agreement. *See **United States v. Whirlwind Soldier***, 499 F.3d 862, 869 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1286 (2008). "The agreement may be in the form of a tacit understanding rather than a formal, explicit agreement." ***Id.***

Under 21 U.S.C. § 841(c), the government must prove Hudspeth possessed or distributed pseudoephedrine "knowing, or having reasonable cause to believe, that . . . [it] will be used to manufacture a controlled substance." **21 U.S.C. § 841(c)**. It is insufficient to show an inadvertent sale of pseudoephedrine to an illegal drug manufacturer. *See **United States v. Brown***, 461 F.3d 1062, 1069 (8th Cir. 2006).

Under 18 U.S.C. § 1956(a)(1)(A)(i), the government must prove that Hudspeth "engaged in financial transactions with the knowing use of the proceeds of illegal activities and with the intent to promote the carrying on of unlawful activity." ***United States v. Parker***, 364 F.3d 934, 948 (8th Cir. 2004) (internal quotation marks omitted).

Here, there was sufficient evidence to convict for conspiracy to distribute pseudoephedrine. As this court noted in *United States v. Bewig*, 354 F.3d 731 (8th Cir. 2003), in discussing the sufficiency of the evidence for a conspiracy charge:

> We believe a reasonable jury could have concluded that Mr. Bewig entered into a conspiratorial agreement with parties known and unknown to distribute pseudoephedrine for the purposes of making illegal narcotics. . . .

-12-

First, it is of consequence to us that pseudoephedrine has limited legal uses. . . . Pseudoephedrine is an over-the-counter decongestant. Unlike sugar, if you do not have a cold, a headache, or sinus problems there are remarkably few things you can do with pseudoephedrine except make illegal narcotics. Sales of such a limited product to routine customers, and in bulk, suggest that Mr. Bewig was acting merely as the "legitimate" front to an organized drug scheme.

Second, Mr. Bewig knew that pseudoephedrine was used to make methamphetamine. . . .

Third, Mr. Bewig's distributor informed him that he was ordering pseudoephedrine at a disproportionately high rate. Thus, unlike single transactions for staple goods, or goods susceptible to multiple legal uses, Mr. Bewig's disproportionately high sales of pseudoephedrine suggest agreement in the illegal endeavor. . . . He knowingly made the supplying of a necessary ingredient to illegal drug production a continuing part of his business; he became part of the venture.

Fourth, the nature of the sales transactions suggests an illegal goal. Mr. Bewig had in the past sold pseudoephedrine in case amounts. While he nominally had a three-unit limit, pseudoephedrine was continually sold in larger than three-unit amounts, or to the same patron over a period of a day in multiple three-unit sales. . . .While there was some dispute as to Mr. Bewig's knowledge of these transactions, a reasonable jury could have imputed the knowledge to him, as he was solely responsible for reordering the pseudoephedrine once the station's supply was exhausted.

In short, we cannot say as a matter of law that there was insufficient evidence to support the conviction. A reasonable jury could have concluded that Mr. Bewig not only sold pseudoephedrine with the knowledge that it would be made into methamphetamine but agreed to become part of that illegal end.

*Bewig*, 354 F.3d at 736-37. Similarly, here, Hudspeth was distributing pseudoephedrine, he knew it could be used in the manufacture of meth, the DEA agent

informed him that she was concerned about the amount of pseudoephedrine he was selling in relation to Handi-Rak's other products, he repeatedly sold more than the 48-box limit to customers, and he was responsible for reordering the pseudoephedrine. Moreover, Hudspeth also advised his salesmen how to make it look like they were not exceeding the 48-box limit. *See Brown*, 461 F.3d at 1069-70. This is sufficient evidence to show a conspiracy to distribute pseudoephedrine illegally.

Despite this evidence, Hudspeth insists there was no agreement because the salesmen testified there was no agreement. A conspiracy conviction, however, does not require evidence of an explicit agreement. *See Whirlwind Soldier*, 499 F.3d at 869. A tacit understanding is sufficient to convict. *See id.* Here, the evidence is more than enough to demonstrate an understanding among Hudspeth and the salesmen. *See Bewig* 354 F.3d at 736-37; *Brown*, 461 F.3d at 1070.

There was also sufficient evidence to convict for conspiracy to commit money laundering and two counts of money laundering. Count 35 charges Hudspeth with conspiracy to commit money laundering with Mike Williams, a Handi-Rak salesman and coconspirator, listing checks to Handi-Rak from The Castle, and to Cumberland Swan from Handi-Rak, as overt acts of the conspiracy. Counts 37 and 38 charge that Hudspeth directed two checks to be sent to Cumberland Swan, representing the commingled proceeds from the sale of pseudoephedrine: (1) check 22262, dated February 5, 2001, drawn on Handi-Rak's account at Metropolitan National Bank, in the amount of $12,889.36, for pseudoephedrine orders in invoice 361005; and (2) check 23257, dated February 1, 2002, drawn on Handi-Rak's account at UMB Bank, in the amount of $12,210.69, in part for pseudoephedrine in invoices 463825, 463826, and 464043.

For the conspiracy conviction, Hudspeth argues there was no agreement with Williams, stating Williams serviced The Castle on his own without prior approval from Hudspeth, Williams stopped delivering to The Castle, again without prior approval of Hudspeth, and Williams testified there was no agreement with Hudspeth. However, as noted, a conspiracy conviction does not require evidence of an explicit, formal agreement. *Whirlwind Soldier*, 499 F.3d at 869. A tacit understanding is enough to convict. *See id.* Williams testified he talked to Hudspeth about his concerns of delivering large amounts of pseudoephedrine to The Castle because it was a head shop. Hudspeth never told him to stop delivering to The Castle. Williams said that he would turn in his paperwork and checks to the bookkeeper or Hudspeth. He testified to several occasions where he delivered more than the 48-box limit to The Castle. Williams further stated that he mostly sold only pseudoephedrine to The Castle. Other evidence showed Hudspeth was the one responsible for complying with the law, managing the salesmen, and ordering and paying for the pseudoephedrine. This is sufficient evidence to show that Hudspeth and Williams had a tacit understanding to commit money laundering.

For the substantive convictions, Hudspeth claims the checks to Cumberland Swan represent nothing other than the corporate act of Handi-Rak paying its supplier. He also asserts the government presented no evidence that he directed the payments himself. Contrary to these assertions, evidence at trial demonstrated that Handi-Rak used one account to deposit payments received from customers, pay overhead expenses and payroll, and pay invoices. The bookkeeper testified Hudspeth signed every check and would sometimes handle the paperwork and checks received from the salesmen. Hudspeth also was responsible for reordering pseudoephedrine. According to other evidence, Hudspeth had knowledge that customers were diverting the pseudoephedrine to persons who manufactured meth. This is sufficient evidence to show that Hudspeth knowingly reinvested the illegal proceeds into Handi-Rak with

the intent to carry on an illegal scheme – distributing pseudoephedrine to persons involved in manufacturing meth.[4]  *See **Parker***, 364 F.3d at 950.

The district court did not err in denying the motions for judgment of acquittal.

IV.

During deliberations, the jury asked the district court, "What is the Court's definition of money laundering in this case?"  After conferring with the parties, the court responded, "There are many different ways to commit money laundering.  You should use Instruction 25, 28 and 29 to determine if money laundering occurred in this case."  Hudspeth insists the court erred because the instructions did not provide a definition of money laundering, the evidence in the case suggested only one way to commit money laundering, and the court's response did not answer the jury's question.

"'A trial court's response to a jury's request for supplemental instruction is a matter within the sound discretion of the trial court,' which we review for abuse of discretion." ***United States v. Abdul-Aziz***, 486 F.3d 471, 476 (8th Cir. 2007), *quoting* ***United States v. Beckman***, 222 F.3d 512, 521 (8th Cir. 2000).  The "'trial court must take great care to insure that any supplemental instructions are accurate, clear, neutral, and non-prejudicial,' answering 'with concrete accuracy, and within the specific limits

---

[4]Hudspeth contends the check dated February 5, 2001, does not represent the proceeds from unlawful activity because Williams did not start servicing The Castle until June 2001, and Kelly did not start servicing C&M until October 2001.  However, the illegal scheme started before June and October 2001.  Evidence demonstrated that on October 18, 2000, and December 21, 2000, Handi-Rak sold large amounts of pseudoephedrine to two different customers.  A reasonable juror could have reasoned that the proceeds of these sales were deposited into Handi-Rak's account, commingled with other assets, and used to purchase (in part) more pseudoephedrine with the February 5 check.  This is sufficient.  *See **Santoyo-Torres***, 518 F.3d at 623.

of the question presented.'" ***United States v. Levine***, 477 F.3d 596, 604 (8th Cir.), *cert. denied*, 127 S. Ct. 3023 (2007), *quoting* ***United States v. Morrison***, 332 F.3d 530, 532 (8th Cir. 2003). "This court has recognized that, in responding to a jury's request for supplemental instruction, it may be proper at times to simply refer the jury back to the original instructions." ***Abdul-Aziz***, 486 F.3d at 476.

As discussed, to convict for money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), the government must prove that Hudspeth "engaged in financial transactions with the knowing use of the proceeds of illegal activities and with the intent to promote the carrying on of unlawful activity." ***United States v. Parker***, 364 F.3d 934, 948 (8th Cir. 2004) (internal quotation marks omitted). The government must also demonstrate the financial transactions affected interstate or foreign commerce. **18 U.S.C. § 1956(c)(4)**.

Instruction 25 addresses conspiracy to commit money laundering and refers the jury to earlier instructions, defining the elements of committing an illegal financial transaction. Instructions 28 and 29 relate to the two substantive counts of money laundering. Specifically, Instruction 28 explains that the crime of conducting an illegal financial transaction has four essential elements:

> *One*, on or about February 5, 2001, the defendant, Roy James Hudspeth, signed check number #22262, drawn on account #100204056, Handi-Rak Drug Services, Inc. at Metropolitan National Bank, said check paid in the amount of $12,889.36, on February 14, 2001, to Cumberland Swan-Dept. #78141, in part for pseudoephedrine orders in invoice #361005, said amount representing commingled assets from the illegal sale of pseudoephedrine to Handi-Rak customers;

> *Two*, the defendant conducted the financial transaction with $12,889.36 in United States currency that involved the proceeds of the unlawful distribution of pseudoephedrine;

*Three*, at the time the defendant conducted the financial transaction, the defendant knew the $12,889.36 in United States currency represented the proceeds of some form of unlawful activity; and

*Four*, the defendant conducted the financial transaction with the intent to promote the carrying on of the unlawful distribution of pseudoephedrine.

Instruction 29 provides similarly as to the transaction on February 1, 2002, check #23257, in the amount of $12,210.69, paid to Cumberland Swan-Dept. in part for pseudoephedrine.  Instruction 29 also provides "which in any way or degree affected interstate or foreign commerce."

Here, the court's response to the jury question was proper.  Although evidence in the case only presented one form of money laundering, the statute itself provides multiple ways to commit money laundering.  *See* **18 U.S.C. § 1956(a)**.  Further, the court referred the jury back to the instructions, which describe the specific way that money laundering was charged in the case.  Here, that was proper.  *See **Abdul-Aziz**,* 486 F.3d at 476.

The district court did not abuse its discretion.

V.

Hudspeth also claims that Instructions 23 and 28 do not adequately instruct the jury on the issue of interstate commerce.  Hudspeth did not object to the jury instructions; they are reviewed for plain error.  *See **United States v. Refert**,* 519 F.3d 752, 756 (8th Cir. 2008).  "Plain error only exists if (1) there was an error, (2) the error was plain, (3) the error affected [Hudspeth's] substantial rights, and (4) a failure to grant relief would seriously affect the fairness, integrity, or public reputation of judicial proceedings."  **Id.**

Instruction 28, quoted above, properly lists the essential elements of the crime of money laundering. Although the instruction does not expressly mention that the financial transaction had to affect interstate or foreign commerce, element one requires the jury to find an effect on interstate commerce – that a signed check from Metropolitan National Bank was paid to Cumberland Swan in part for pseudoephedrine. Evidence at trial demonstrated that Metropolitan National Bank is in Missouri and that the check to Cumberland Swan was mailed to Michigan. Cumberland Swan's headquarters are in Tennessee. This is sufficient to require a finding of an effect on interstate commerce.

Instruction 23, similarly, requires a finding of an effect on interstate commerce. It lists the same two checks as in Instructions 28 and 29, which were paid from Handi-Rak's bank in Missouri to Cumberland Swan, a Tennessee corporation. It also lists a check signed by Melissa Deputy of The Castle, in the amount of $249.60, from an account at the Peoples Bank of the Ozarks. The check was payable to Handi-Rak for the purchase of pseudoephedrine. By the evidence, the Peoples Bank of the Ozarks is insured by the Federal Deposit Insurance Corporation. This is sufficient to show an effect on interstate commerce. *See United States v. Parker*, 364 F.3d 934, 951 (8th Cir. 2004) (exhibit showing bank is insured by Federal Deposit Insurance Corporation is enough to show an effect on interstate commerce).

There is no plain error. The instructions fairly and adequately submitted the issues to the jury. *See United States v. Hayes*, 518 F.3d 989, 994 (8th Cir. 2008).

VI.

The judgment of the district court is affirmed.

_____